[Cite as *Claris, Ltd. v. Hotel Dev. Servs., L.L.C.*, 2018-Ohio-2602.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Claris, Ltd., | : | |
| Plaintiff-Appellee, | : | |
| | : | No. 16AP-685 |
| v. | : | (C.P.C. No. 14CV-4516) |
| Hotel Development Services, LLC, | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |
| Claris, Ltd., | : | |
| Plaintiff-Appellee, | : | |
| | : | No. 16AP-727 |
| v. | : | (C.P.C. No. 14CV-4516) |
| Hotel Development Services, LLC, | : | (REGULAR CALENDAR) |
| Defendant-Appellee, | : | |
| (Westfield Insurance Company, | : | |
| Intervenor-Appellant). | : | |

D E C I S I O N

Rendered on June 29, 2018

**On brief:** *Wilson Lawyers LLC*, and *James D. Wilson*, for Claris, Ltd. **Argued:** *James D. Wilson.*

**On brief:** *Eastman & Smith Ltd.*, and *Bryan L. Jeffries*, for Hotel Development Services, LLC. **Argued:** *Bryan L. Jeffries.*

**On brief:** *Isaac Wiles Burkholder & Teetor, LLC*, and *Scyld D. Anderson*, for Westfield Insurance Company. **Argued:** *Scyld D. Anderson.*

APPEALS from the Franklin County Court of Common Pleas

KLATT, J.

{¶ 1}  Defendant-appellant, Hotel Development Services, LLC ("HDS"), appeals a judgment of the Franklin County Court of Common Pleas entered in favor of plaintiff-appellee, Claris, Ltd. Intervenor-appellant, Westfield Insurance Company ("Westfield"), also appeals. For the following reasons, we reverse the judgment and remand this case to the trial court to enter a directed verdict in HDS' favor.

{¶ 2}  On August 24, 2005, Claris and HDS executed a contract in which HDS agreed to build Claris a 4-floor, 122-room hotel in the Polaris area of Columbus, Ohio. Claris planned to operate the hotel as a Candlewood Suites, a brand owned by InterContinental Hotels Group. HDS began construction in September 2005, and it completed the hotel late in the summer of 2006. Claris opened the Polaris Candlewood Suites in September 2006.

{¶ 3}  This case concerns the construction of the hotel's exterior walls. For the most part, the exterior walls are covered with exterior insulation and finish system ("EIFS"), a building cladding system that resembles stucco. Stacked-stone veneer covers a relatively small portion of the hotel at the first-floor level.

{¶ 4}  The hotel's exterior walls contain multiple layers. The innermost layer is drywall, which is attached to the inner side of the wooden framing. Oriented strand board ("OSB") sheaths the outer side of the framing. Batt insulation is wedged between the framing studs. Before the installation of the EIFS, the builder affixed to the OSB sheathing a water-resistive barrier, which is a pliable sheet material. The first step of installing the EIFS involved mechanically fastening expanded-polystyrene insulation boards to the water-resistive barrier. Over the insulation boards, the EIFS subcontractor applied a base coat into which the subcontractor embedded a fiberglass mesh. Finally, the subcontractor applied more base coat and a finish coat over the mesh.

{¶ 5}  The outermost EIFS coating is watertight; water cannot penetrate it unless the surface is broken. After installing the EIFS, the EIFS subcontractor applied sealant to

bridge junctures between adjacent building components to prevent water infiltration.[1] Sealant fills the expansion joints in the EIFS and the joints between the EIFS and the windows, as well as the EIFS and the sleeves holding the packaged-terminal-air-conditioner ("PTAC") units. The PTAC units are located directly beneath the windows.

{¶ 6} Behind the cladding and sealant, the openings for the windows and PTAC units are surrounded by tape-like, flexible flashing to prevent water intrusion. Incidental water that penetrates through the cladding or sealant is intended to slide over the flashing and onto the water-resistive barrier.

{¶ 7} The water-resistive barrier provides the last, innermost layer of protection against water infiltration. The water-resistive barrier used on the Polaris Candlewood Suites—Tyvek StuccoWrap—serves as a drainage plane. StuccoWrap is corrugated, so when installed, the StuccoWrap creates narrow, vertical spaces for water to collect and drain to the bottom of the wall.

{¶ 8} In July 2013, hotel guests began to complain of water intrusion in rooms 128, 228, 328, and 428, i.e., the "28 bank" of the hotel. When it rained, water penetrated the exterior wall around the windows and PTAC units. Claris hired Elford, Inc., a general contracting company, to investigate and fix the leaking.

{¶ 9} To complete its repair work, Elford removed the EIFS and water-resistive barrier from the exterior wall outside of the 28 bank. The removal of the outermost wall layers revealed sizable patches of organic growth on the OSB sheathing. For the most part, the organic growth was concentrated below the PTAC units. Such organic growth is consistent with moisture exposure.

{¶ 10} Additionally, at the first-floor level, water saturated the OSB sheathing, framing, and batt insulation. At higher levels, a moisture meter showed high levels of water within the OSB sheathing.

{¶ 11} After the repair and restoration of the exterior wall outside of the 28 bank, Claris hired Professional Service Industries, Inc. ("PSI") to assess the entire building envelope. Initially, PSI visually examined the condition of the hotel exterior and conducted water tests of certain windows. PSI then opened the exterior walls at 11 locations around

---

[1] During trial, witnesses used the word "sealant" interchangeably with "caulk." We will simply use "sealant" in this decision.

the hotel to view the condition of the wall components and determine the extent of the water damage. As Konrad Surlej, the PSI project manager, later explained, PSI observed a number of deficiencies, which he defined as "something not performing as intended or perhaps not installed per industry standard or what we would have expected to see, as well as perhaps some components missing." (Tr. at 696-97.) PSI also found evidence of water damage at 10 of the 11 openings.

{¶ 12} On April 25, 2014, Claris sued HDS for breach of the construction contract. HDS filed a third-party complaint seeking indemnification from its subcontractors, including Five Star Plastering; Inloes Mechanical, Inc.; JHP Construction, Inc.; and Michael J. Baumann and Co., Inc. ("Baumann").[2] After securing leave of court, Westfield intervened and sought a declaratory judgment stating that it was not obligated to provide coverage to HDS under its commercial general liability policy for any of Claris' damages.

{¶ 13} Trial on Claris' claim for breach of contract occurred between August 16 and 26, 2016. For purposes of this appeal, we will recount the expert testimony introduced at trial regarding and relating to the cause of the water damage to the exterior walls.

{¶ 14} Surlej, Claris' expert witness, testified to the multiple deficiencies PSI identified in the wall assembly. First, Surlej stated that sheet-metal flashing "would usually be called for and installed at any penetration through the wall," but the Polaris Candlewood Suites did not have any such flashing.[3] (Tr. at 702.) Surlej also indicated that he would expect to see sheet-metal flashing at the horizontal expansion joints in the EIFS and at the base of the exterior walls. However, there was no sheet-metal flashing in those areas.

{¶ 15} Sheet-metal flashing has an L-shape, with a lip protruding from the end of the horizontal leg of the L. When installed, the vertical leg of the L is covered by the water-resistive barrier, and the horizontal leg extends through the wall assembly to the outside. Water flowing down the water-resistive barrier strikes the horizontal leg of the L, which directs the water out of the wall assembly through a small gap above the horizontal leg. The

---

[2] None of the third-party defendants are parties to this appeal. The claims against most of the third-party defendants were dismissed prior to trial. The trial court dismissed the claims against Baumann after the parties reached a settlement during trial.

[3] Throughout his testimony, Surlej referred to sheet-metal flashing by various names, including through-wall flashing, drip edges, starter strips (or starter tracks), and drain strips (or drain tracks). Surlej explained that different manufacturers denominate sheet-metal flashing differently. For clarity, we will refer to all such flashing solely as "sheet-metal flashing."

water then drips off the protruding lip and falls away from the building. Surlej explained that sheet-metal flashing acts as a "control mechanism" that directs water away from a building, preventing that water from "follow[ing] the path of least resistan[ce], which could be toward the interior." (Tr. at 719.)

{¶ 16} Second, Surlej categorized the sealants as in poor condition, meaning they had failed or could not be relied upon to perform their original function. In most locations, the sealant was pulling away from substrate it was intended to adhere to and/or was failing to hold together, causing tears within the sealant material. Additionally, no sealant was present around the windows and PTAC units surrounded by the stacked-stone veneer or the pipes and vents protruding from the exterior walls.

{¶ 17} Third, Surlej testified to countless cracks in the EIFS surface. There were also areas where the EIFS surface coat was missing, exposing the fiberglass mesh. Fourth, Surlej testified that the tape-like, flexible flashing was improperly lapped at the PTAC sleeves, either because the flashing did not achieve a shingling effect or not enough flashing extended over the edges of the PTAC sleeve. Fifth, Surlej stated that, in some cases, sheets of the water-resistive barrier did not lap or insufficiently lapped over sheets located below and to the sides.

{¶ 18} Although Surlej testified to the above deficiencies, he was never asked if those deficiencies caused any of the water damage to the hotel. However, when asked to summarize PSI's results and findings, Surlej stated:

> [S]tarting from the exterior, we commented on the deficiencies of the sealants we observed, some of the surface deficiencies in the actual EIFS because we did find some cracks, some penetration, some areas where there was just not enough material installed and you can see the exposed reinforcing mesh underneath.
>
> Going beyond that, obviously we commented on the fact that we didn't see some [sheet-metal] flashings or some flashings that we were expecting to see at some of these locations. And then going further and detailing some of the issues with the flexible flashings that [were] installed, either lapped incorrectly or not carried properly with enough of an overlap onto the material.
>
> Same went [with] the weather-resistive barrier. We had locations where [the sheets] simply did not touch or didn't

> overlap or if they overlapped, it was documented to be less than the [four] inches which would be anticipated or is an industry standard and seen in other projects.
>
> Beyond that, we obviously saw a lot of evidence of OSB deterioration, corroded sections from section loss, *all leading us to the conclusion that there is, at least at the time of our visit, * * * water exposure resulting in the level of deterioration that we did see.*

(Emphasis added.)  (Tr. at 749-50.)

{¶ 19} Claris' attorney subsequently inquired whether the replacement of the sealant could resolve the problems with the exterior walls.  Surlej answered:

> No[.] * * * [I]f we felt that sealant was the primary cause or the only issue that * * * we observed, our report essentially would have stopped and stated that.  Based on the evidence and the results we were finding, we felt that we needed to go further and we were able to discover other deficiencies.
>
> So sealant has a component obviously in this by allowing some water behind, but what we were able to discover is that there [were] some deficiencies with the installation of the components concealed by the face of the EIFS and also discovered the lack of a mechanism to expel water or essentially a drainage system in [the] EIFS itself and the assembly.

(Tr. at 761-62.)

{¶ 20} HDS called its own expert witness, Michael D. Lewis.  Before offering any opinions, Lewis agreed to provide those opinions to a reasonable degree of architectural certainty.  Lewis then declared that the damage to the Polaris Candlewood Suites occurred when the sealant around the windows and PTAC units failed, allowing water to leak through the joints.  The water that entered the wall assembly through the joints accumulated between the expanded-polystyrene insulation boards and the water-resistive barrier.  That water flowed down the water-resistive barrier and emptied through openings in the base of the walls.  However, the excessive amount of water streaming through the open joints caused the humidity level between the insulation boards and the water-resistive barrier to rise to, and stay at, 100 percent.  Water then diffused across the water-resistive barrier and into the less humid interior side of the wall, causing water damage to the OSB sheathing and the framing.

{¶ 21} According to Lewis, the sealant failed due to normal weathering. Claris failed to maintain the sealant or replace it when it failed.

{¶ 22} HDS moved for directed verdict twice: once at the conclusion of Claris' case in chief and, again, at the close of all evidence. HDS argued that it was entitled to judgment as a matter of law because Claris failed to prove that a breach of the construction contract caused Claris' damages. The trial court denied both of HDS' motions. At the conclusion of the proceedings, the jury rendered a verdict in Claris' favor and awarded $631,200 in damages.

{¶ 23} On September 29, 2016, the trial court issued a final judgment. In addition to entering the jury's verdict, the final judgment declared that Westfield had to pay HDS 50 percent of the damage award, or $315,600, under the commercial general liability policy.

{¶ 24} HDS appeals the September 29, 2016 judgment and assigns the following errors:

> [1.] THE TRIAL COURT ERRED IN NOT GRANTING HDS' MOTIONS FOR DIRECTED VERDICT BECAUSE THERE WAS LEGALLY INSUFFICIENT EVIDENCE TO PROVE THAT ANY BREACH OF CONTRACT BY HDS CAUSED THE WATER DAMAGE TO THE HOTEL.
>
> [2.] THE JURY'S VERDICT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE BECAUSE CLARIS DID NOT PRESENT ANY EVIDENCE TO PROVE THAT A BREACH OF CONTRACT BY HDS, INCLUDING THOSE FOUND IN JURY INTERROGATORY NO. 2, CAUSED THE ALLEGED DAMAGE TO THE HOTEL.
>
> [3.] THE TRIAL COURT ABUSED ITS DISCRETION IN ADMITTING CLARIS' EXPERT REPORT BECAUSE IT WAS INADMISSIBLE HEARSAY AND WAS PREJUDICIAL TO HDS.

{¶ 25} Westfield also appeals the final judgment, and it assigns the following errors:

> [1.] The trial court erred in holding that the jury's allocations of 50% of the damages to EIFS, and 50% to professional services, applied concurrently rather than cumulatively.
>
> [2.] The trial court erred in failing to hold that the EIFS exclusion and the "professional services" exclusion each independently exclude coverage for all damages awarded to the plaintiff.

{¶ 26} By HDS' first assignment of error, it argues that the trial court erred in denying its motions for directed verdict.  We agree.

{¶ 27} A court must grant a motion for directed verdict "if, after construing the evidence most strongly in favor of the party against whom the motion is directed, 'reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party.' "  *Goodyear Tire & Rubber Co. v. Aetna Cas. & Sur. Co.*, 95 Ohio St.3d 512, 2002-Ohio-2842, ¶ 3, quoting Civ.R. 50(A)(4).  Although this analysis requires a court to review and consider the evidence, a motion for directed verdict presents a question of law because the court must examine the sufficiency of the evidence, not weigh the evidence or try the credibility of the witnesses.  *Wagner v. Roche Laboratories*, 77 Ohio St.3d 116, 119-20 (1996); *Malone v. Courtyard by Marriott Ltd. Partnership*, 74 Ohio St.3d 440, 445 (1996).  "Faced with the question of sufficiency through a directed verdict motion, the court must determine whether any evidence exists on every element of each claim or defense for which the party has the burden to go forward." *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 25.  As a motion for directed verdict presents a question of law, an appellate court applies the de novo standard of review. *Goodyear Tire & Rubber Co.* at ¶ 4.

{¶ 28}    To establish a claim for breach of contract, a plaintiff must prove:  (1) the existence of a contract, (2) performance by the plaintiff, (3) breach by the defendant, and (4) damages or loss resulting from the breach.  *Lucarell v. Nationwide Mut. Ins. Co.*, 152 Ohio St.3d 453, 2018-Ohio-15, ¶ 41; *Jarupan v. Hanna*, 173 Ohio App.3d 284, 2007-Ohio-5081, ¶ 18 (10th Dist.).  Under the fourth element, " '[i]n order to recover more than nominal damages for breach of contract[,] a plaintiff must prove that he suffered a loss resulting from the defendant's actions.' "  *Ed Stinn Chevrolet, Inc. v. Natl. City Bank*, 28 Ohio St.3d 221, 233 (1986), quoting *Isaac v. Am. Heritage Bank & Trust Co.*, 675 P.2d 742, 745 (Colo. 1984).  Thus, "[i]t is axiomatic that damages must be the natural and proximate result of the defendant's breach." *Mills v. Best Western Springdale*, 10th Dist. No. 08AP-1022, 2009-Ohio-2901, ¶ 13; *accord Cammerer Farms v. Terra Internatl., Inc.*, 12th Dist. No. CA91-02-020 (Dec. 23, 1991) ("It is fundamental that in order for a party to a contract to recover damages as a result of another's breach of that contract, the damages must have been actually caused by the breach, or would not have occurred had the defendant

performed the promises which he made in the contract."). With the exception of nominal damages, "[d]amages are not awarded for a mere breach of contract; the amount of damages awarded must correspond to injuries resulting from the breach." *Textron Fin. Corp. v. Nationwide Mut. Ins. Co.*, 115 Ohio App.3d 137, 144 (9th Dist.1996); *accord Raze Internatl., Inc. v. Southeastern Equip. Co.*, 7th Dist. No. 14 JE 0015, 2016-Ohio-5700, ¶ 64; *Corsaro v. ARC Westlake Village, Inc.*, 8th Dist. No. 84858, 2005-Ohio-1982, ¶ 20.

{¶ 29} To prevail in the case at bar, Claris had to prove that one or more breaches of the construction contract proximately caused the water damage to the hotel. HDS contends—and Claris concedes[4]—that Claris needed to present expert testimony to fulfill that burden.

{¶ 30} A party need not present expert testimony where the subject of an inquiry is within the common, ordinary experience and knowledge of a layperson. *Jones v. Hawkes Hosp.*, 175 Ohio St. 503 (1964), paragraph one of the syllabus. On the other hand, "where the inquiry pertains to a highly technical question of science or art or to a particular professional or mechanical skill," expert testimony is required. *Id.*; *accord Harris v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 13AP-466, 2013-Ohio-5714, ¶ 16 ("Generally, where an issue involves a question of scientific inquiry that is not within the knowledge of a layperson, expert testimony is required."). "Experts have the knowledge, training and experience to enlighten the jury concerning the facts and their opinion regarding the facts." *Ramage v. Cent. Ohio Emergency Servs., Inc.*, 64 Ohio St.3d 97, 102 (1992).

{¶ 31} As we will discuss further below, in this case, the jury had to determine whether HDS constructed the exterior walls of the hotel in compliance with the Ohio Building Code, the project specifications, and the project drawings. The jury then had to decide whether a violation of the Ohio Building Code, project specifications, and/or project drawings caused the water damage. To accomplish these tasks, the jury needed to understand the means and methods of constructing exterior walls clad with EIFS, the purpose and function of the various components of exterior walls clad with EIFS, and what sort of failings in the construction and/or components could result in water damage to the

---

[4] Claris' attorney made this concession during oral argument.

interior layers of exterior walls. All these matters are outside of the common, ordinary experience and knowledge of a layperson. Expert testimony, therefore, was required.[5]

{¶ 32} In civil cases, Ohio courts require expert opinions to rise to the level of probabilities before being admitted under Evid.R. 702. *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, ¶ 81. Thus, an expert witness testifying regarding causation must state his opinion in terms of probability. *Stinson v. England*, 69 Ohio St.3d 451 (1994), paragraph one of the syllabus. "An event is probable if there is a greater than fifty percent likelihood that it produced the occurrence at issue." *Id.*

{¶ 33} The admissibility of expert testimony does not turn on an expert witness' use of particular "magic words." *Rhodes v. Firestone Tire & Rubber Co.*, 10th Dist. No. 08AP-314, 2008-Ohio-4898, ¶ 11. However, the expert's testimony must equate to an expression of probability when viewed in its entirety. *Id.* Expert testimony that does not meet the probability threshold constitutes mere speculation. *Shumaker v. Oliver B. Cannon & Sons, Inc.*, 28 Ohio St.3d 367, 369 (1986).

{¶ 34} Here, Claris' expert witness, Surlej, identified five deficiencies that "all [led PSI] to the conclusion that there [was], at least at the time of our visit, * * * water exposure resulting in the level of deterioration that we did see." (Tr. at 750.) Surlej, however, did not designate any of the five deficiencies, whether alone or in combination, as the probable cause of Claris' damages. The only testimony Surlej offered regarding the likelihood that a particular deficiency resulted in Claris' damages was his opinion that the failure of the sealant was not the "primary cause" of the water damage. (Tr. at 761.) At best, this testimony excluded the failed sealant as the probable cause of the water damage. However, it did nothing to pinpoint which of the other deficiencies was the probable cause. Surlej's testimony, therefore, is not competent evidence of the proximate cause of the water damage.

{¶ 35} Equally troubling, Claris presented evidence establishing only one of the deficiencies—the lack of sheet-metal flashing—as a breach of the construction contract. Under Section 3.7.2 of the general conditions incorporated into the construction contract, HDS had to "comply with and give notices required by laws, ordinances, rules, regulations

---

[5] For this reason, we will not consider the testimony of Anthony S. Jones or Mitchell S. Sweeney in our analysis. Neither witness qualified as an expert.

and lawful orders and all other requirements of public authorities applicable to performance of the Work." (Ex. 14.) According to Claris, Section 3.7.2 required HDS to satisfy all provisions of the Ohio Building Code in effect at the time it constructed the hotel.

{¶ 36} Pursuant Section 1403.2 of the 2005 Ohio Building Code:

> Exterior walls shall provide the building with a weather-resistant exterior wall envelope. The exterior wall envelope shall include flashing, as described in Section 1405.3. The exterior wall envelope shall be designed and constructed in such a manner as to prevent the accumulation of water within the wall assembly *by providing a water-resistive barrier behind the exterior veneer * * * and a means for draining water that enters the assembly to the exterior of the veneer.*

(Emphasis added.) (Ex. 62.) Section 1405.3 stated that "[f]lashing shall be installed in such a manner so as to prevent moisture from entering the wall or to redirect it to the exterior." *Id.*

{¶ 37} Surlej opined that the hotel's exterior walls contained a water-resistive barrier, but lacked a means for draining water that entered the wall assembly. The colloquy between Claris' attorney and Surlej explicates that opinion:

> Q: * * * And can you explain based on the observations that you noted, you know, what is being required here in [Section 1403.2] and what was inconsistent in regards to this with what you saw?
>
> A: Well, what we looked at and what [Section 1403.2] references is that the exterior wall has to provide a weather-resistant exterior envelope, which we know is kind of the entire assembly, and it calls out flashings specifically and * * * specifies that the intent of those flashings is to prevent accumulation of water within the * * * wall assembly * * *.
>
> Q: And so you did not necessarily see this type of performance requirement in what you observed, correct?
>
> A: * * * [C]orrect, this references some of those through-wall flashings and the drip edges and the mechanism to expel water from behind the EIFS system to the exterior [that were not incorporated into the Polaris Candlewood Suites].

(Tr. at 755-56.)   Thus, in Surlej's opinion, due to the lack of sheet-metal flashing, the exterior walls of the Polaris Candlewood Suites did not include a means for draining water that entered the wall assembly.

{¶ 38} During cross-examination, Surlej acknowledged that the exterior walls included openings at the base so water draining down the water-resistive barrier could exit the wall assembly.   However, Surlej opined that those openings did not constitute an adequate means for draining water because the exterior walls did not contain any sheet-metal flashing to control the water and direct it away from the walls.   Moreover, Surlej interpreted Section 1405.3 to impliedly require sheet-metal flashing.   HDS, therefore, violated Sections 1403.2 and 1405.3 of the 2005 Ohio Building Code when it failed to install sheet-metal flashing.   Given Surlej's testimony, Claris presented sufficient evidence that the failure to use sheet-metal flashing breached the construction contract.[6]

{¶ 39} Beyond that breach, the record contains no evidence that any of the other deficiencies breached the construction contract.   On appeal, Claris claims that the other deficiencies violated the project specifications.   Part of the parties' contract, the project specifications set forth the technical requirements for all the materials and workmanship HDS had to provide when constructing the hotel.   Claris points to no evidence that explains how the other deficiencies constituted a breach of any of the project specifications.   Claris even fails to identify a particular provision of the project specifications that the other deficiencies allegedly violated.

{¶ 40} Therefore, construing the evidence in a manner most favorable to Claris, the record demonstrates that only one of the multiple deficiencies that caused the water damage amounted to a breach of the construction contract.   In such a situation, a plaintiff may still recover for a breach of contract.   Generally, in a breach-of-contract action, a defendant must pay damages equivalent to the total harm suffered, even if factors other than the breach contributed to causing that harm.   2 Perillo, *Corbin on Contracts*, Section 55.9, at 31 (Rev.Ed.2005).   However, "when the plaintiff's total injury may have been the result of many factors, in addition to the defendant's breach of the contract, the plaintiff, in

---

[6] Claris also elicited testimony that HDS failed to install the sheet-metal flashing that the project drawings required within the sections of the exterior walls clad in stacked-stone veneer.  As the construction contract incorporated the project drawings, HDS' failure to install that sheet-metal flashing constituted a breach of two sections of the contract:  Section 3.7.2 of the general conditions and the project drawings.

order to establish injury, must show that the defendant's breach was a substantial factor in causing the injury." *Cammerer Farms*, 12th Dist. No. CA91-02-020 (Dec. 23, 1991); *accord Havens Steel Co. v. Randolph Eng. Co.*, 613 F.Supp. 514, 532 (W.D.Mo.1985) (stating that, under the "ordinary contracts rule applicable to damages involving multiple causes," "if the defendant's breach or fault was a 'substantial factor' in causing the injury, the defendant will bear full responsibility for it even though there were other, contributing causes"); *Audette v. Cummings*, 165 N.H. 763, 771 (2013) ("The plaintiffs were not required to prove that the defendants' breach of contract was the sole or exclusive cause of the harm they suffered, but only that the breach was a substantial factor in bringing about their damages."); *Parke State Bank v. Akers*, 659 N.E.2d 1031, 1035 (Ind.1995) (" 'The test of causation in common law contract actions is not whether the breach was the only cause, but whether the breach was a substantial factor in bringing about the harm.' "); *Wells v. Uvex Winter Optical, Inc.*, 635 A.2d 1188, 1191 (R.I.1994) (holding that the defendant's actions of breaching the contracts at issue "must have been a substantial or primary cause" of the plaintiff's injuries in order for the plaintiff to recover). A breach of contract is a substantial factor in causing a plaintiff's damages if it is the predominating, primary, real, main, or chief causal factor. *Columbia First Bank, FSB v. U.S.*, 60 Fed.Cl. 97, 104 (2004).

{¶ 41} As we discussed above, Surlej never portioned responsibility for the water damage among the deficiencies. Thus, other than Surlej's opinion that the failed sealant was not the primary cause of the water damage, the record lacks evidence regarding the extent to which each particular deficiency contributed to the water damage. Consequently, the evidence does not establish HDS' breach—the failure to install sheet-metal flashing—as a substantial factor in causing the water damage.

{¶ 42} In sum, the expert testimony Claris adduced regarding causation is insufficient to prove that a breach of the construction contract resulted in the water damage to the hotel. Surlej failed to express his opinions in terms of probability, and he failed to identify the lack of sheet-metal flashing as a substantial factor in bringing about Claris' damages. Therefore, Surlej's testimony does not establish causation.

{¶ 43} Our analysis, however, is not complete. Claris also relies on the testimony of HDS' expert, Lewis, to argue that it proved that a breach of the construction contract caused the water damage. Claris directs this court to the following colloquy:

Q: So we have at least three or four, maybe five different ways that water gets behind [the EIFS layers]. And if water gets behind there and there's no drainage to the outside system, what is going to happen to that water?

A: It will be trapped.

(Tr. at 1553.)

{¶ 44} With this testimony, Lewis admitted that if water cannot drain out of exterior walls, it will remain trapped in the wall assembly. However, contrary to Claris' representations, Lewis refused to concede that water that penetrated the Polaris Candlewood Suites' EIFS layers could not drain to the outside. (*See, e.g.*, Tr. at 1488 ("Q: * * * [D]oes that [water] have the ability to get out of this building to the exterior? A: It does. It ends at the bottom of the wall and out[;] * * * where the stucco wrap ends at the grade, the water evacuates there."); 1539 ("Q: And is [the water-resistive barrier] set up to drain to the outside? A: Yes."); 1540 ("In this case, [water] does go to the outside.").) Because Lewis maintained the exterior walls had openings at the base that allowed water to exit, his testimony cannot demonstrate that the absence of openings caused water damage to the hotel.

{¶ 45} Next, Claris argues that HDS breached the construction contract when it installed EIFS manufactured by Parex instead of EIFS manufactured by one of the three companies named in the project specifications. Claris maintains that Parex's exclusion from the list of approved manufacturers is sufficient evidence of causation. According to Claris, Parex was excluded for a reason, and although Claris cannot articulate that reason, Claris contends that it must have manifested itself and caused the water damage to the hotel.

{¶ 46} HDS does not dispute that its use of Parex EIFS breached the construction contract. It, instead, argues that in order to show that that breach caused the water damage, Claris had to present evidence demonstrating that Parex EIFS possessed a feature, absent in the other brands, which resulted in the water damage. In response, Claris contends that it should not have to carry this burden. It argues that because HDS breached the construction contract, HDS had to prove that Parex EIFS did not contain a difference that caused the water damage.

{¶ 47} As the party seeking to recover for a breach of contract, Claris bears the burden of proving each element of its claim. *Buckeye Telesystem, Inc. v. MedCorp, Inc.*, 6th Dist. No. L-05-1256, 2006-Ohio-3798, ¶ 22; *Preferred Capital, Inc. v. Sturgil*, 9th Dist. No. CA 21787, 2004-Ohio-4453, ¶ 11. Claris wants us to create a rebuttable presumption that once a plaintiff demonstrates a breach of a contract, it is entitled to recover damages unless the defendant shows the breach did not cause those damages. Such a presumption does not exist in contract law. *See Moss v. Sibley*, 2d Dist. No. 17373 (Mar. 5, 1999) (rejecting the same type of argument Claris makes in this case). A plaintiff may not recover upon the weakness of the defense's evidence, but upon the strength of its own proof. *Id.* Consequently, a plaintiff must adduce evidence establishing each element of its claim for breach of contract, including the element requiring the plaintiff to prove that its damages resulted from the breach. In this case, therefore, Claris had to prove that the use of Parex EIFS caused the water damage.

{¶ 48} Claris argues that it satisfied this burden with evidence of Parex's exclusion from the manufacturers listed in the project specifications. We reject this argument because it relies on pure conjecture. Claris presented no evidence regarding the reason for Parex's exclusion, so there is no basis for inferring that that exclusion has any relation to the water damage.

{¶ 49} Finally, Claris argues that HDS breached the construction contract when it failed to secure a special inspection of the EIFS pursuant to Section 1704.12 of the 2005 Ohio Building Code. Claris, however, does not direct this court to any evidence establishing that the lack of a special inspection somehow caused or resulted in the water damage.

{¶ 50} In sum, the record contains insufficient evidence to prove that a breach of the construction contract caused the water damage to the Polaris Candlewood Suites. Accordingly, the trial court erred in denying HDS a directed verdict, and we sustain HDS' first assignment of error.

{¶ 51} Our resolution of HDS' first assignment of error moots HDS' remaining assignments of error in appeal No. 16AP-685 and Westfield's assignments of error in appeal No. 16AP-727. Consequently, we do not address those assignments of error.

{¶ 52} For the foregoing reasons, we sustain HDS' first assignment error, which moots all the other assignments of error in these appeals. We reverse the judgment of the

Franklin County Court of Common Pleas, and we remand this case to the trial court so that it can enter a directed verdict in HDS' favor.

*Judgment reversed;*
*cause remanded with instructions.*

**TYACK and SADLER, JJ., concur.**

————————