[Cite as *Cromartie v. Dept. of Rehab. & Corr.*, 2020-Ohio-2906.]

| | |
|---|---|
| ALTON CROMARTIE | Case No. 2018-00909JD |
| Plaintiff | Magistrate Robert Van Schoyck |
| v. | <u>DECISION OF THE MAGISTRATE</u> |
| DEPARTMENT OF REHABILITATION AND CORRECTION | |
| Defendant | |

{¶1} Plaintiff, an inmate in the custody and control of defendant, brought this action arising from an alleged attack upon him by another inmate, Gary Bland, at the Franklin Medical Center (FMC) on December 6, 2017. According to the complaint, through plaintiff's inmate work assignment he assisted FMC staff in implementing a system to stop inmates from misappropriating commissary funds from elderly inmate-patients. Plaintiff alleged that Bland threatened him with violence for his role in protecting the elderly inmate-patients, as Bland was one of those who had been taking advantage of them. Plaintiff, alleging that he notified FMC staff of the threats, claimed that defendant was negligent in failing to protect him and was consequently liable for his injuries. The issues of liability and damages were bifurcated for trial. The parties later stipulated that, for purposes of plaintiff's negligence claim, defendant breached a duty of care owed to him and proximately caused him some harm. The case then proceeded to trial on the issue of damages.

{¶2} Plaintiff testified that he has lived at FMC, a facility that provides specialized medical services to inmates, since 2013. Plaintiff explained that he has Legg-Calve-Perthes disease, which he characterized as a deteriorative condition of the leg and hip bones. As a result, plaintiff stated, his legs are atrophied and he uses a wheelchair. Recounting the attack, plaintiff testified that it occurred in the evening while he sat in his wheelchair looking out the window of his room in the "2 North" area on the second floor of FMC. Plaintiff was not aware Bland had entered the room and was totally blindsided

when Bland struck him over the head, he recalled. Plaintiff remembered his body moving forward and seeing a metal object in Bland's hand that he thought was used to bludgeon his head. While plaintiff remembered some of what followed, including being kicked in the head, he stated that he started to lose consciousness and cannot say how long the attack lasted nor how it ended. Plaintiff stated that when the attack was over he was extremely confused and did not know where he was. Plaintiff stated that he was lying on the floor with his wheelchair atop him and blood strewn all around.

{¶3} Two people—plaintiff could not recall whether they were inmates or staff— lifted him up and sat him in his wheelchair, he stated. Plaintiff described feeling as if he was in shock and still having no awareness of his surroundings. About 15 minutes later, a corrections sergeant came and took pictures of him, copies of which he authenticated. (Plaintiff's Exhibits 1-5.) Plaintiff stated that when the pictures were taken, his left eye was swollen shut and he could not open his mouth. Plaintiff stated that he did not know where he was bleeding from, but that he had already been changed out of the bloody clothes he had been wearing by the time the pictures were taken and yet he still bled quite a bit more on the new set of clothes shown in the pictures. When asked about pictures that were taken of his hands, plaintiff stated that his left hand sustained some harm in the attack but he could not explain it in any detail.

{¶4} According to plaintiff, he had difficulty getting a nurse to attend to him and when one eventually did come and see him he was told not much could be done, and that a "resource nurse" would determine whether to have him transported to The Ohio State University Medical Center (OSUMC). Plaintiff recalled an inmate porter bringing him ice, and that he still felt confused and not fully alert. Everything hurt, plaintiff recalled, especially his head, face, neck, back, hands, and hip, and he had wounds on his lips and eyebrow.

{¶5} The resource nurse came to see him, plaintiff stated, and decided to send him to OSUMC, and from his recollection it was about one hour or more after the attack

when he left FMC by van.  As far as plaintiff could recall, he had not received any care for his injuries at FMC.  Plaintiff stated that while in the van he had a pounding headache, he could not see out of his left eye, and he was in pain from head to toe.  At OSUMC, plaintiff recalled, the wounds on his lips and eyebrow were sutured, he underwent a CT scan and saw a neurologist, and he was diagnosed with a subdural hematoma, for which he was told he would need to remain under observation for 12 hours to determine if surgery would be necessary.  Plaintiff described his head, hip, back, neck, and face all continuing to hurt.  Plaintiff testified that he left the next day without having to undergo surgery, after having spent about 18 hours total at OSUMC.

{¶6} When he returned to FMC, plaintiff stated, he was still in a lot of pain, he suffered from headaches and confusion, he could not see out of his left eye, he had ringing in his ears, his hip hurt just from sitting in his wheelchair, and his physical appearance was such that some of the corrections officers did not recognize him.  As plaintiff explained, he was placed on the third floor of FMC, which is more of an acute care unit, often housing inmates who are recovering from operations or otherwise need heightened monitoring.  Plaintiff recounted some of the treatment he received there, including getting medication for dizziness and vertigo, conditions that were making it difficult for him to transfer in and out of his wheelchair, and he also recalled having a consultation with an eye doctor.  Plaintiff also stated that he received pain medication, namely Ultram, as he continued experiencing pain in his head, back, and hip.

{¶7} On cross-examination, plaintiff acknowledged that in his deposition he did not mention hip or back pain when identifying the injuries he claims were caused by the attack.  Plaintiff also acknowledged that a nurse evaluated him about once every shift during his time on the third floor at FMC and that he could have told those nurses if his hip or back hurt.  Plaintiff admitted that before the attack he had preexisting hip pain due to his Legg-Calve-Perthes disease, but he asserted that the attack exacerbated the

pain. According to plaintiff, though, he had never sustained any injuries to his head, neck, or back before the attack, nor had he experienced any prior back pain.

{¶8} Plaintiff testified that he spent about five or six weeks in total on the third floor of FMC, and that by the end of that period most all his injuries had improved. Plaintiff stated that the swelling in the face and head had substantially dissipated, he was able to open his left eye, and he was able to open his jaw, which he said he had been unable to do initially. But, he still had headaches and hip and back pain, he stated. Plaintiff also related that he continued to experience mental and emotional issues stemming from the attack. Plaintiff explained that he visited with mental health professionals while he recovered on the third floor of FMC and continued to do so after returning to his original room on the second floor of FMC. Plaintiff admittedly received regular mental health care prior to the attack, but he explained that after the attack he had trouble sleeping, felt depressed and mentally unstable, and he felt fear when he would see anyone who resembled inmate Bland. Plaintiff talked about how he would see things on television news programs about victimized people and it would upset him, so he stopped watching the news. Plaintiff described how he continued seeing his mental health care providers regularly to understand what he was going through, including his fear, nightmares, and inability to sleep, and his overall state of mind, and he stated that he was prescribed medication for anxiety and depression. Plaintiff authenticated a kite (handwritten internal prison correspondence) that he sent to a psychologist at FMC expressing his fear and anxiety over the potential for him and inmate Bland to cross paths. (Plaintiff's Exhibit 7.)

{¶9} Up to the present time, plaintiff stated, he still experiences hip and back pain, headaches, and vision problems that he attributes to the attack. The frequency of the headaches has diminished, though, and he no longer experiences the confusion or dizziness that he once did, he stated. It was plaintiff's testimony that his vision has never been the same since the attack, with blurred vision and difficulty focusing being

the main problems, and that prescription eyeglasses have been ineffective at correcting these issues.  Plaintiff indicated that one particular eye has had the most problems, but he gave conflicting testimony about which eye it is.  According to plaintiff, while sitting at trial the main symptom he experienced that he attributes to the attack was vision problems, and depending on how he sat in his wheelchair he had some intermittent pain in his hip and back.  Regarding his back pain, plaintiff stated that it emanates out from the lower portion of his spine.  Plaintiff testified that a physician prescribed physical therapy for his back pain several months before trial, which he found helpful.

{¶10} Kenneth Blissenbach, M.D. testified that he has been licensed to practice medicine since 1970 and has worked at several state correctional institutions, including FMC for about ten years on and off.  Dr. Blissenbach went over his education and training background and related that he is board-certified in psychiatry and neurology.  Dr. Blissenbach explained that he sees plaintiff about every two to three months for treatment of unspecified depressive disorder and bipolar II disorder.  According to Dr. Blissenbach, plaintiff's mental health treatment was generally consistent before and after the attack.  On several occasions though, during regular visits or informal chats in the hallways of FMC, plaintiff discussed the attack with him and complained of flashbacks, nightmares, and hypervigilance about the attacker's whereabouts, Dr. Blissenbach stated.  He would take note of and acknowledge plaintiff's complaints, Dr. Blissenbach stated, and respond with empathy, and the last time he documented such complaints from plaintiff was in March 2018, about three months after the attack.

{¶11} When asked about the criteria for diagnosing post-traumatic stress disorder (PTSD), Dr. Blissenbach explained that, in general, PTSD involves something happening outside the usual human experience that results in flashbacks, nightmares, intrusive thoughts, hypervigilance or other symptoms that significantly impact one's social and occupational functioning six months or more after the incident.  Dr. Blissenbach testified that he did not diagnose plaintiff with PTSD because plaintiff's

condition never seemed to rise to that level. Dr. Blissenbach found plaintiff to be a resilient person who found comfort and meaning in his work assignment, through which he helped other inmates, and to Dr. Blissenbach it appeared plaintiff was able to cope with what he had gone through. Dr. Blissenbach did not prescribe any new medications in connection with plaintiff's symptoms after the attack, he stated, and instead kept plaintiff on the same prescription medications he had been getting before the attack.

{¶12} Dr. Blissenbach was asked about some notes that he or a colleague, Dr. John Garrity, made corresponding to several visits they had with plaintiff in December 2017; among other things, the notes documented plaintiff's ongoing concerns about his placement within FMC. (Plaintiff's Exhibit 9; Defendant's Exhibit A.) Dr. Blissenbach explained that Dr. Garrity was plaintiff's mental health liaison, and that Dr. Michael Witter, whom plaintiff talked about communicating with in his testimony, was chief of the psychology department at FMC. Dr. Blissenbach testified that his progress notes from a January 22, 2018 visit with plaintiff reflect that plaintiff said "I'm doing fine" and that he did not raise the same kind of concerns he had in December 2017. (Defendant's Exhibit B.) Dr. Blissenbach was asked if he specifically questioned plaintiff during that January 22, 2018 encounter whether he was having flashbacks or other symptoms stemming from the attack, and he explained that he did not, adding that plaintiff is generally a positive person and he did not want to dredge up unpleasant things.

{¶13} Corrections Officer Yansetta Hamilton briefly testified about an Incident Report that she prepared after the attack. (Plaintiff's Exhibit 10.) Among other things, Hamilton wrote in the Incident Report that after observing Bland exit plaintiff's room, she entered the room and saw plaintiff on the floor, underneath his wheelchair, and that his face was bloody and he had a large amount of blood on his clothing. Hamilton testified that she secured the doors to plaintiff and Bland's rooms, went to get medical attention, and contacted a lieutenant.

{¶14} Loraine Damcheu, R.N. testified that she works as a nurse at FMC and on rare occasions has provided medical care to plaintiff. Damcheu identified a "shift assessment" that she prepared for plaintiff on December 10, 2017, when he was being observed in the "3 North" area on the third floor of FMC. (Plaintiff's Exhibit 11, pp. 272-273.) All inmates there receive an assessment by a nurse every shift, where vital signs and other information is charted, Damcheu explained. If an inmate complains of pain, for example, the nurse will note that in the assessment and identify where the pain is located, Damcheu stated. In the December 10, 2017 shift assessment, Damcheu noted that plaintiff complained of a headache with the pain being a 5 on a scale of 1 to 10. Damcheu also identified a January 13, 2018 shift assessment in which she noted that plaintiff denied having any complaints about his head, but that he complained of aching pain in his right hip which he rated as a 6 on a scale of 1 to 10. (Defendant's Exhibit C.)

{¶15} Halimat Oyabambi, R.N. testified that she works as a nurse at FMC and has provided medical care to plaintiff several times. Oyabambi remembered caring for plaintiff when he returned from OSUMC and continuing to do so for some time while he was in the 3 North area of FMC, and while she could not recall specifically what had happened to him, she recalled that he had undergone some physical trauma and that his face was swollen. Oyabambi identified a shift assessment that she prepared for plaintiff on December 20, 2017, in which she noted that he complained of pain in his head that he rated as a 6 on a scale of 1 to 10, and that he complained of sharp pain in his left hip that he rated as a 6 on a scale of 1 to 10. (Plaintiff's Exhibit 11, pp. 196-198.) Patients in the 3 North area receive assessments from nurses at the beginning of each eight-hour shift, Oyabambi explained, and she cares for about ten patients there each day. Oyabambi identified a shift assessment that she prepared on December 31, 2017, in which she noted a headache that plaintiff rated as a 4 on a scale of 1 to 10. (Id., pp. 102-104.) In another shift assessment identified by Oyabambi, she noted on January 8, 2018, that plaintiff denied any head pain, but complained of right hip pain

that he rated as a 6 on a scale of 1 to 10.  (Id., pp. 14-16.)  On January 10, 2018, Oyabambi testified, she noted in a shift assessment that the only pain plaintiff complained of was a sore throat.  (Defendant's Exhibit D.)  Oyabambi also testified that she noted in a January 11, 2018 shift assessment that the only pain plaintiff complained of was in his left hip.  (Defendant's Exhibit E.)

{¶16} Ajmal Shamim, M.D. testified that he has worked for defendant for more than nine years, that he has been licensed to practice medicine in Ohio for approximately 14 years, and that he previously practiced in New York for about ten years.  Dr. Shamim gave some explanatory testimony about plaintiff's emergency room records from OSUMC, including that a CT scan showed a small subdural hematoma on the left aspect of the brain, with no midline shift, meaning that no brain tissue moved from one side to the other.  (Plaintiff's Exhibit 12.)  According to Dr. Shamim, typical symptoms of a hematoma include headaches, confusion and disorientation, and small hematomas usually resolve on their own, without surgery.  Dr. Shamim discussed the reports of the CT scans that plaintiff underwent at OSUMC and explained how they were repeated to make sure the hematoma was not getting bigger.  (Plaintiff's Exhibit 11, pp. 280-288.)  Dr. Shamim explained that, insofar as soft tissue swelling was revealed via CT scan, the reported locations were in the cheekbones (with more swelling in the right than the left) and the upper part of the right eye socket.  (Id., p. 281.)  Dr. Shamim was asked about a report from a chest x-ray that was performed at OSUMC, but he did not know why it was performed.  (Id., pp. 278-279.)

{¶17} Dr. Shamim stated that he saw plaintiff when he returned from OSUMC, at which time he had a swollen face and other signs of trauma, including lacerations on the right side of both lips and the left eyebrow.  Plaintiff complained of a headache and dizziness, but was alert, Dr. Shamim stated.  Looking at progress notes from his assessment of plaintiff the following day, December 8, 2017, Dr. Shamim recounted that plaintiff was doing fairly well, with no headache but having some pain around the eyes.

(Defendant's Exhibit F.)  Dr. Shamim noted that plaintiff was not excessively sleepy and did not have dizziness nor blurred or double vision; he stated that a subdural hematoma can affect one's vision.  Dr. Shamim recorded his observations about the wounds to the lips and eyebrow and wrote that the sutures in them would be removed in seven days. Dr. Shamim also wrote that plaintiff would get neurological checks every shift for the next 48 hours, but that there appeared to be no neurological deficits and that he anticipated transferring plaintiff out of the third floor acute care unit, back to his room in 2 North, a long-term care unit.

{¶18} As he continued following up with plaintiff, Dr. Shamim related, plaintiff remained stable and Dr. Shamim was pleased overall with the progression of his clinical improvement.  The lacerations improved, Dr. Shamim stated, but plaintiff continued having some complaints of headaches and dizziness.  In progress notes that he made on December 11, 2017, Dr. Shamim documented plaintiff's complaints of headaches and dizziness, although plaintiff continued to have no neurological deficits and appeared the same clinically, and he wrote that he planned to have plaintiff undergo another CT scan of the brain.  (Defendant's Exhibit G.)  In the December 11, 2017 progress notes, Dr. Shamim also noted that plaintiff could not be transferred back to his room in 2 North for security reasons, even though he stated that plaintiff was stable enough to do so. Medical records show that on December 14, 2017, Dr. Shamim requested that a nurse remove the sutures from the wounds to plaintiff's lips and eyebrow, and this was done the next morning.  (Defendant's Exhibit H; Plaintiff's Exhibit 11, p. 229.)

{¶19} Dr. Shamim testified that as plaintiff continued to complain of headaches and dizziness, he sent plaintiff back to the emergency room at OSUMC where a CT scan of the brain could be performed to make sure that the subdural hematoma was not getting larger; medical records show that this occurred on December 17, 2017, after plaintiff complained of headaches that were not relieved by pain medication.  (Plaintiff's Exhibit 11, pp. 213-218.)  Dr. Shamim identified progress notes that he made the day

after plaintiff returned from the emergency room.  (Defendant's Exhibit I.)  The results of the CT scan performed during the emergency room visit showed the subdural hematoma was "slightly decreased" compared with the last scan, from December 7, 2017, Dr. Shamim wrote.   (Id.)   Nevertheless, plaintiff continued to complain of headaches, according to Dr. Shamim.  Dr. Shamim wrote in progress notes from a December 28, 2017 visit with plaintiff that plaintiff still complained of a headache and dizziness, but that the dizziness was made better by medication that Dr. Shamim had prescribed.  (Plaintiff's Exhibit 11, pp. 125-127; Defendant's Exhibit J.)  Also during that visit, Dr. Shamim noted that the sutures had been removed and the lacerations were healed, and he noted once again that plaintiff had been medically cleared to return to the 2 North long-term care unit.  (Id.)

{¶20} Dr. Shamim testified that progress notes from a January 8, 2018 visit with plaintiff showed that plaintiff still complained of a headache but reported his dizziness to be better.  (Plaintiff's Exhibit 11, pp. 9-11.)  Dr. Shamim also wrote that he renewed plaintiff's prescriptions for Ultram and Tylenol at plaintiff's request, after plaintiff reported that he ran out of Ultram and then could not sleep due to pain, although Dr. Shamim referred to plaintiff's pain symptoms in the note as being a "chronic" condition.  (Id.)  Dr. Shamim explained that chronic conditions are basically ongoing issues, and plaintiff had regularly scheduled "chronic care" appointments before and after the events at issue in this case due to multiple chronic health issues.  Dr. Shamim testified that from his visits with plaintiff, there is no record of plaintiff complaining that his chronic hip condition, which Dr. Shamim referred to as avascular necrosis, was exacerbated by the injuries sustained in the attack.

{¶21} Progress notes that Dr. Shamim made during a regular chronic care appointment with plaintiff on February 12, 2018, reflect that plaintiff reported his dizziness was better, and that his headaches were "much better" although he still got them "on and off."  (Defendant's Exhibit K.)  Dr. Shamim noted at that time that he had

put in a request for another CT scan to follow up on the subdural hematoma.  (Id.)  But obtaining a CT scan, Dr. Shamim stated, is typically subject to defendant's "collegial review" process, whereby the treating doctor essentially requests the scan and it is up to defendant's statewide medical director to review the request and either approve or deny it.  Dr. Shamim explained that in an emergency, he can send a patient to an emergency room without going through the collegial review process, which is how he arranged plaintiff's last CT scan at OSUMC on December 17, 2017.  An addendum to the February 12, 2018 progress notes documented that the request made that day for another CT scan was denied two days later, Dr. Shamim stated.  (Id.)  Dr. Shamim could not specifically recall his last visit with plaintiff, but he said that it was not recent.

{¶22} "In order to sustain an action for negligence, a plaintiff must show the existence of a duty owing from the defendant to the plaintiff or injured party, a breach of that duty, and that the breach was the proximate cause of resulting damages."  *Sparre v. Ohio Dept. of Transp.*, 10th Dist. Franklin No. 12AP-381, 2013-Ohio-4153, ¶ 9.  "'It is axiomatic that every plaintiff bears the burden of proving the nature and extent of his damages in order to be entitled to compensation.'"  *Jayashree Restaurants, LLC v. DDR PTC Outparcel LLC*, 10th Dist. Franklin No. 16AP-186, 2016-Ohio-5498, ¶ 13, quoting *Akro-Plastics v. Drake Indus.*, 115 Ohio App.3d 221, 226, 685 N.E.2d 246 (11th Dist.1996).  "As a general rule, the appropriate measure of damages in a tort action is the amount which will compensate and make the plaintiff whole."  *N. Coast Premier Soccer, LLC v. Ohio Dept. of Transp.*, 10th Dist. Franklin No. 12AP-589, 2013-Ohio-1677, ¶ 17.  "[D]amages must be shown with reasonable certainty and may not be based upon mere speculation or conjecture * * *."  *Rakich v. Anthem Blue Cross & Blue Shield*, 172 Ohio App.3d 523, 2007-Ohio-3739, 875 N.E.2d 993, ¶ 20 (10th Dist.).

{¶23} "A party need not present expert testimony where the subject of an inquiry is within the common, ordinary experience and knowledge of a layperson."  *Claris, Ltd. v. Hotel Dev. Servs., LLC*, 2018-Ohio-2602, 104 N.E.3d 1076, ¶ 30 (10th Dist.).

However, in general, "where an issue involves a question of scientific inquiry that is not within the knowledge of a layperson, expert testimony is required." *Harris v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. Franklin No. 13AP-466, 2013-Ohio-5714, ¶ 16; *see also Tunks v. Chrysler Group LLC*, 6th Dist. Lucas No. L-12-1297, 2013-Ohio-5183, ¶ 18 ("Where complicated medical problems are at issue, testimony from a qualified expert is necessary to establish a proximate causal relationship between the incident and the injury.").

{¶24} Upon review, the magistrate makes the following findings. On December 6, 2017, inmate Bland perpetrated a violent attack upon plaintiff for which defendant has stipulated liability. Bland approached plaintiff from behind and struck him in the head without warning while he sat in his wheelchair, defenseless. Bland knocked plaintiff out of the wheelchair and delivered multiple blows to his head, apparently with a metal weapon, such that he became disoriented and cannot fully recall what happened. When it was over, plaintiff was on the floor, beneath his wheelchair. Plaintiff was cut across his lips and his left eyebrow, and he bled significantly.

{¶25} After Corrections Officer Hamilton summoned medical assistance, the nursing staff evaluated plaintiff and arranged for him to be transported to the emergency room at OSUMC. During this time, plaintiff's face was very swollen, so much so around his left eye that he could not see out of it, and he could not open his mouth, he felt confused and not fully alert, and he hurt all over, especially in his head, face, neck, back, hip, and hands. By the time he was being taken to OSUMC, plaintiff had a pounding headache.

{¶26} Emergency room records from OSUMC show, among other things, that plaintiff reported left-sided frontal head pain resulting from trauma to the head during the attack, and that he underwent CT scans of his head and face, and an x-ray of his chest. As a result of the CT scans, plaintiff was diagnosed with a subdural hematoma, and soft tissue swelling was revealed in both the cheekbones, more so in the right cheekbone,

and in the upper part of the right eye socket. The wounds on plaintiff's lip and left eyebrow were closed with eleven or twelve sutures in total for the three lacerations. (Plaintiff's Exhibit 11, pp. 46, 48, 242.) The doctors caring for plaintiff at OSUMC kept him under observation overnight before performing a second CT scan of the head to determine whether the subdural hematoma was getting larger. Plaintiff understood from his care providers that if the subdural hematoma grew larger, it might require surgical intervention. When the CT scan of the head was repeated early the next morning, on December 7, 2017, there was no appreciable change in the size of the subdural hematoma and plaintiff was discharged back to FMC later that day.

{¶27} When plaintiff returned to FMC, he was placed in an acute care unit where nurses assessed him at least once every shift. Plaintiff's face was still quite swollen, he was still in great pain, and he was having headaches and dizziness. Two days after the attack, though, on December 8, 2017, plaintiff had begun to improve and he had no dizziness or headaches that day. (Plaintiff's Exhibit 11, pp. 35, 39, 32, 41; Defendant's Exhibit F.) When Dr. Shamim saw him that day, plaintiff did report some pain around the eyes, but he had no neurological deficits, and Dr. Shamim determined that from a medical perspective plaintiff was ready to leave the acute care unit and return to his room in the long-term care unit, although Dr. Shamim still wanted him to get neurological checks every shift for the next 48 hours.

{¶28} Despite being medically cleared to leave the acute care unit, plaintiff remained there for security reasons for at least one month. As plaintiff continued to be seen by nurses and Dr. Shamim, he reported intermittent headaches and, to a lesser extent, dizziness. Plaintiff was prescribed medication to alleviate his dizziness, a condition that made it difficult to transfer in and out of his wheelchair. Plaintiff's headaches were treated with pain relief medication, primarily Ultram, which he had already been taking for chronic left hip pain. One week after the attack, on December 13, 2017, plaintiff's intermittent headaches were improving and his facial swelling was

"getting better."  (Plaintiff's Exhibit 11, p. 238.)  On December 15, 2017, plaintiff's right jaw remained slightly swollen, and the sutures in his lips and left eyebrow were removed.  (Id., p. 227.)  Plaintiff's lacerations healed by late December 2017, as Dr. Shamim documented; however, it was apparent from observing plaintiff at trial that his lips are scarred.

{¶29} Although plaintiff continued to exhibit no neurological deficits, due to his intermittent headaches and dizziness and the limited relief he was getting for his headaches from Ultram, Dr. Shamim sent him back to the emergency room at OSUMC on December 17, 2017, for another CT scan of the head.  As the scan revealed, the subdural hematoma was still present, having "slightly decreased" in size compared to the last scan, ten days earlier.  The nursing assessments show that for about the next three weeks, plaintiff continued to report intermittent headaches with pain that he rated between 4 and 8 on a scale of 1 to 10, with some infrequent dizziness.  The headaches became less frequent in January 2018, according to the nursing assessments, and by February 12, 2018, the headaches were "much better," as Dr. Shamim noted, but still occurred "on and off," and the dizziness was "better" as well.  (Defendant's Exhibit K.)  Given the lack of medical records or specific, meaningful testimony about plaintiff's symptoms from that time onward, the evidence does not support a finding that plaintiff's headaches or dizziness persisted much longer.

{¶30} Although plaintiff testified that he still has headaches today which he attributes to the injuries he sustained in the attack, the evidence does not support such a finding, particularly because plaintiff had no supporting expert testimony.  There is no dispute that after the blunt trauma to his head, resulting in a subdural hematoma, plaintiff's symptoms at least temporarily included headaches.  As Dr. Shamim explained, headaches are a common symptom of a subdural hematoma.  But, plaintiff's subdural hematoma was not shown to be a permanent injury, and his claim of long-term or permanent headache symptoms falls into the category of a complicated internal

medical issue that is difficult for a layperson to understand in the absence of supporting testimony from a medical expert. *See Corwin v. St. Anthony Med. Ctr.*, 80 Ohio App.3d 836, 840-841, 610 N.E.2d 1155 (10th Dist.1992) ("Where the permanency of an injury is obvious, such as the loss of an arm, leg or other member, the jury may draw its own conclusions as to the measure of damages; however, where an injury is not obvious, there must be expert evidence as to the damage sustained, the probability of future pain and suffering or the permanency of the injury.").

{¶31} While plaintiff testified that he believes the injuries from the attack permanently exacerbated his preexisting chronic hip pain, nowhere in the medical records was any such exacerbation or complaint of exacerbation noted, nor did Dr. Shamim recall any such complaint. The nursing shift assessments reflect intermittent complaints of hip pain, but plaintiff clearly had chronic hip pain before the events at issue in this case due to the deteriorative condition in his hip.

{¶32} Plaintiff also complained of having present-day back pain that he attributes to the attack, but again the evidence presented fails to support such a finding. Conversely, plaintiff on numerous occasions denied having any back pain during the nursing assessments that were performed while he was in the acute care unit.

{¶33} Regarding plaintiff's present-day vision problems that he attributes to the attack, he did not present sufficient evidence to substantiate any causal relationship. There was no expert testimony to support such a finding, and while plaintiff's left eye was swollen shut for a time just after the attack, the medical records only show a few complaints of redness in the eyes, primarily the right eye, in the days after the attack, and plaintiff consistently denied having double vision or blurry vision. The evidence plainly fails to demonstrate that the attack proximately caused the long-term vision problems plaintiff complained of at trial.

{¶34} In terms of mental anguish and emotional distress, plaintiff endured intense suffering from the appalling, brutal attack. On top of the physical pain that he endured

for some time afterward, there was a deleterious effect on his mental and emotional well-being as well. With inmate Bland remaining at FMC, plaintiff worried about encountering him again, and plaintiff was forced to stay away from his room in the 2 North unit for security reasons for several weeks, leaving him anxious about his future placement and worried that the personal property he had in his room might be lost or stolen. Plaintiff had frightful thoughts when he saw other inmates who resembled Bland, he had nightmares and trouble sleeping, and there were things that would upset him such as seeing someone on television who was victimized. Plaintiff, who is bipolar and already received regular mental health care, saw his care providers several times at his request after the attack to talk about what he was going through and his concerns, but the overall course of mental health treatment that he had been receiving did not change. In contrast to his previous encounters with the mental health professionals following the attack, plaintiff was "doing fine" by the time of a January 22, 2018 follow-up visit with Dr. Blissenbach. (Defendant's Exhibit B.) Plaintiff last discussed the attack with Dr. Blissenbach in March 2018, and it does not appear that plaintiff has sought mental health counseling relating to the attack since that time. While plaintiff argued that his symptoms are consistent with PTSD, Dr. Blissenbach explained why he did not feel plaintiff's symptoms rose to that level. Still, it was evident at trial that the events at issue in this case are painful for plaintiff to revisit.

{¶35} Based upon the foregoing, plaintiff is entitled to damages for his pain and suffering in the amount of $30,000. Accordingly, it is recommended that judgment be entered for plaintiff in that amount.

{¶36} *A party may file written objections to the magistrate's decision within 14 days of the filing of the decision, whether or not the court has adopted the decision during that 14-day period as permitted by Civ.R. 53(D)(4)(e)(i). If any party timely files objections, any other party may also file objections not later than ten days after the first objections are filed. A party shall not assign as error on appeal the court's adoption of*

*any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion within 14 days of the filing of the decision, as required by Civ.R. 53(D)(3)(b).*

ROBERT VAN SCHOYCK
Magistrate

**Filed March 19, 2020**
**Sent to S.C. Reporter 5/12/20**