[Cite as *Turfco Landscaping, Inc. v. Shenigo*, 2021-Ohio-4259.]

# IN THE COURT OF APPEALS OF OHIO
## ELEVENTH APPELLATE DISTRICT
## PORTAGE COUNTY

| | |
|---|---|
| TURFCO LANDSCAPING, INC., | CASE NO. 2020-P-0006 |
| Plaintiff-Appellee, | |
| - v - | Civil Appeal from the Court of Common Pleas |
| FRANK SHENIGO, | |
| Defendant-Appellant. | Trial Court No. 2017 CV 00203 |

**O P I N I O N**

Decided: December 6, 2021
Judgment: Affirmed as modified

*Jack B. Cooper*, Milligan Pusateri Co., LPA, P.O. Box 35459, 4684 Douglas Circle, N.W., Canton, OH 44735 (For Plaintiff-Appellee).

*Tyler J. Whitney*, Burdon & Merlitti, 137 South Main Street, Suite 201, Akron, OH 44308 (For Defendant-Appellant).

THOMAS R. WRIGHT, J.

{¶1} Appellant, Frank Shenigo ("Shenigo"), appeals the trial court's judgment in favor of appellee, Turfco Landscaping, Inc. ("Turfco"), in the amount of $75,506.04. The judgment is modified to $75,505.88 and affirmed as modified.

{¶2} Beginning in 2012, Turfco, a landscaping and snow removal company, leased commercial property from Shenigo to store equipment and vehicles. Turfco filed suit against Shenigo in 2017 for replevin, conversion, breach of contract, tortious interference with business contracts and relationships, and punitive damages. Turfco

alleged that "Shenigo and/or his agents have recently locked Turfco out of the Property and wrongfully taken possession of Turfco's property, purposely and intentionally damaging it, and refused to release certain vehicles and equipment belong to Turfco." Shenigo answered and filed a counterclaim for breach of contract, property damage, and conversion.

{¶3} The case was tried to a magistrate, who decided that judgment should be granted against Shenigo on the complaint and counterclaim in the amount of $133,259.06. The magistrate made the following relevant findings of fact and conclusions of law:

> On or about February 2, 2017, Defendant caused Plaintiff to be locked out [of] the premises. * * * Defendant refused to explain the reasoning for the lockout to Plaintiff. When Defendant locked out Plaintiff from the property, Plaintiff's business equipment was in the buildings on the property and Plaintiff had no access to [the] same. Due to the lockout, Plaintiff could not continue to maintain his landscaping/snow removal contracts. Plaintiff lost customers and contracts due to his inability to perform services as his commercial equipment was inaccessible. Plaintiff lost profits and had to cease business due to the lost business.
>
> Plaintiff's sales for the period of February 1, 2016 through March 15, 2016 were $38,243.65 pursuant to business records. Plaintiff's sales for February 1, 2017 through March 15, 2017, during the lockout, were $9,569.20 pursuant to business records.
>
> Plaintiff's sales for the period of February 1, 2016 through June 1, 2016 were $211,036.10 pursuant to business records. Plaintiff's sales for the period of February 1, 2017 through June 1, 2017 were $22,271.00 pursuant to business records.
>
> One of the clients that Plaintiff lost was Ramco, which was responsible for $114,570.00 in sales from February 1, 2016 through June 1, 2016. The Ramco sales were $0 in sales for 2017. Shane Polen [the owner of Turfco] testified that Ramco

2

canceled the contract because Plaintiff could not serve Ramco during the lockout.

Another client that Plaintiff lost due to the lockout was H.M. Miller, which was responsible for $44,959.50 in sales from February 1, 2016 through June 1, 2016. The H.M. Miller sales were $0 in 2017.

Plaintiff's profit margin on its work was 60% of sales. Plaintiff lost $188,765.10 in sales as a result of the lockout or $113,259.06 in profit.

{¶4} Shenigo filed objections to the magistrate's decision, to which Turfco responded in opposition. The trial court upheld the magistrate's decision in Turfco's favor on the complaint and counterclaim but sustained one of Shenigo's objections as to the amount of damages. The trial court found that "the Magistrate incorrectly calculated the damages and awarded Plaintiff 60% profit loss instead of the testified to amount of 40% profit loss" and, accordingly, reduced the damages award to $75,506.04.

{¶5} Shenigo appealed and advances three assignments of error:

[1.] The trial court erred and abused its discretion in granting Turfco Landscaping a judgment against Shenigo for reason that Turfco Landscaping did not meet its burden of proof.

[2.] The trial court erred and abused its discretion in granting Turfco Landscaping a judgment against Shenigo for reason that Turfco Landscaping's evidence was insufficient.

[3.] The trial court's judgment in favor of Turfco Landscaping and against Shenigo was against the manifest weight of the evidence.

{¶6} Shenigo challenges the weight and sufficiency of the evidence, raising a similar argument under each assignment of error:

The trial court based [its] judgment solely on self-serving Sales Summaries produced and testified to by Turfco Landscaping. No other evidence was produced by Turfco Landscaping. No contracts, no bank records, no other

3

testimony [sic]. Turfco Landscaping did not meet its burden of proof on these facts and its evidence was insufficient and the granting of the judgment in favor of Turfco Landscaping was against the manifest weight of the evidence.

{¶7} "A challenge to the sufficiency of the evidence * * * requires a court to determine whether [a party] has met its burden of production at trial. * * * In contrast, in deciding whether a [judgment] is against the manifest weight of the evidence, an appellate court determines whether [a party] has appropriately carried its burden of persuasion." *State v. Thompkins*, 78 Ohio St.3d 380, 390, 678 N.E.2d 541 (1997) (Cook, J., concurring). "In a civil case, in which the burden of persuasion is only by a preponderance of the evidence, * * * evidence must still exist on each element (sufficiency) and the evidence on each element must satisfy the burden of persuasion (weight)." *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 19.

{¶8} The sufficiency of the evidence refers to "that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." (Citation omitted.) *Thompkins* at 386. In a civil context, the relevant inquiry is whether, after viewing the evidence in a light most favorable to the prevailing party, any rational trier of fact could have found the elements of the claim proven by a preponderance of the evidence, i.e., that the existence of facts supporting the claim is more likely than their nonexistence. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus; *State ex rel. Doner v. Zody*, 130 Ohio St.3d 446, 2011-Ohio-6117, 958 N.E.2d 1235, ¶ 54.

{¶9} The weight of the evidence concerns "the inclination of the *greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the

4

other." (Emphasis sic.) (Citation omitted.) *Thompkins* at 387. "The [reviewing] court * * * weighs the evidence and all reasonable inferences, considers the credibility of the witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered." (Citation omitted.) *Id.*; *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25 ("a reviewing court asks whose evidence is more persuasive").

{¶10} "In order for a plaintiff to recover lost profits in a breach of contract action, the amount of the lost profits, as well as their existence, must be demonstrated with reasonable certainty." *Gahanna v. Eastgate Properties, Inc.*, 36 Ohio St.3d 65, 521 N.E.2d 814 (1988), syllabus. "Damages which are speculative are not recoverable." (Citation omitted.) *Burlington Group, Inc. v. Chardon Lakes Inn Restaurant, Inc.*, 11th Dist. Geauga No. 94-G-1839, 1995 WL 236919, *3 (Mar. 24, 1995). "Evidence of the past performance of an established business 'will form the basis for a reasonable prediction as to the future.'" *Id.*, quoting *AGF, Inc. v. Great Lakes Heat Treating Co.*, 51 Ohio St.3d 177, 181, 555 N.E.2d 634 (1990). "Although lost profits need not be proven with mathematical precision, the evidence and theory of the case must provide the finder of fact with known, reliable factors that can reasonably guide the computation of damages." (Citation omitted.) *Carey v. Down River Specialties, Inc.*, 8th Dist. Cuyahoga No. 103595, 2016-Ohio-4864, ¶ 29; *Charles R. Combs, Trucking Inc. v. Internatl. Harvester Co.*, 12 Ohio St.3d 241, 244, 466 N.E.2d 883 (1984) (lost profits "need only be reasonable, not specific").

{¶11} At trial, Shane Polen ("Polen"), Turfco's founder and owner, was the sole

5

witness to testify on behalf of Turfco. At the time of the lockout in February 2017, Turfco had around seven employees primarily for salting and plowing, removing holiday lights, edging and mulching. Polen testified, based on his experience in running Turfco, that the profit margin on sales was around 40 percent.

{¶12} Polen testified that for the period of February 1 through March 15, 2016, Turfco generated sales in the amount of $38,243.65 from commercial snowplowing customers that re-signed with the company every year. Polen testified that for that same period of time in 2017, i.e., during the lockout, Turfco generated sales in the amount of $9,569.20.

{¶13} Polen further testified that the loss of the snow removal contracts at the time of the lockout led to the loss of landscaping business, due to a loss of trust and credibility with his customers. Expanding the timeline for calculating losses, he testified that Turfco generated sales in the amount of $22,271.00 from February 1 through June 1, 2017. The year prior, in 2016, Turfco had generated sales in the amount of $211,036.10 for that same time period.

{¶14} Counsel asked Polen to testify about the loss of Turfco's two largest customers. Income from Ramco and HM Miller was $114,570.00 and $44,959.50, respectively, from February 1 through June 1, 2016. Polen testified these customers cancelled their contracts as a result of Turfco's inability to service their properties during the lockout and generated no income from February 1 through June 1, 2017.

{¶15} Polen's testimony was corroborated by the admission, without objection, of Plaintiff's Exhibit 6 (the 2016 accounting summaries) and Exhibit 7 (the 2017 accounting summaries), which provide as follows:

6

### Sales by Customer Summary
#### February 1 through March 15, 2016

| | |
|---|---:|
| Graphic Detail | 980.00 |
| Henry Wahner | 740.00 |
| HM Miller – 1225 Waterloo Road | 23,386.50 |
| Hudson Presbyterian | 2,510.01 |
| K.S.U. Alpha Phi House Corp. | 3,461.28 |
| K.S.U. Phi Gamma Theta | 660.00 |
| Northeast Eye Surgeons | 4,024.66 |
| Northeast Eye Surgeons – Stow | 1,597.86 |
| Paino Construction | 0.00 |
| Portage Community Health Resources | 883.34 |
| Ramco | 0.00 |
| **TOTAL** | **38,243.65** |

### Income by Customer Summary
#### February 1 through June 1, 2016

| | |
|---|---:|
| Graphic Detail | 980.00 |
| Henry Wahner | 740.00 |
| HM Miller | 44,959.50 |
| Hudson Presbyterian | 4,183.35 |
| K.S.U. Alpha Phi House Corp. | 3,461.28 |
| K.S.U. Phi Gamma Theta | 660.00 |
| Lemasters, Craig & Lisa | 25,262.25 |
| McDougal, Shel | 4,058.00 |
| Northeast Eye Surgeons | 7,199.32 |
| Northeast Eye Surgeons – Stow | 3,195.72 |
| Paino Construction | 0.00 |
| Portage Community Health Resources | 1,766.68 |
| Ramco | 114,570.00 |
| **TOTAL** | **211,036.10** |

### Sales by Customer Summary
#### February 1 through March 15, 2017

| | |
|---|---:|
| Aberth, Eloise | 15.00 |
| Bennett, Susan | 50.00 |
| Berns, Richard & Faye | 50.00 |
| Burns, Patrick | 40.00 |
| Clevenger, Jean | 40.00 |
| Flinn, James & Dorothy | 15.00 |
| Henry Wahner | 500.00 |
| Hudson Presbyterian | 1,673.34 |

7

| | |
|---|---|
| K.S.U. Phi Gamma Theta | 340.00 |
| Kendel, Jim & Wanda | 40.00 |
| Korosa, Luan | 40.00 |
| Kronander, Bob | 50.00 |
| Lords House of Prayer | 50.00 |
| Nicols, Bonnie | 20.00 |
| Northeast Eye Surgeons | 4,024.66 |
| Northeast Eye Surgeons – Stow | 1,597.86 |
| Portage Community Health Resources | 883.34 |
| Sassaman, Kathy | 40.00 |
| Scott, Chuck | 40.00 |
| Shatrich, Harriet | 15.00 |
| Shatrich, Stefanie | 15.00 |
| Toth, Bob | 15.00 |
| Toth, Louise | 15.00 |
| **TOTAL** | **9,569.20** |

| Income by Customer Summary | |
|---|---|
| February 1 through June 1, 2017 | |
| Aberth, Eloise | 15.00 |
| Bellamy, Warren | 120.00 |
| Bennett, Susan | 110.00 |
| Berns, Richard & Faye | 200.00 |
| Burns, Patrick | 160.00 |
| Clevenger, Jean | 160.00 |
| Deger, Lisa | 90.00 |
| Flinn, James & Dorothy | 105.00 |
| Henry Wahner | 1,000.00 |
| Hudson Presbyterian | 3,346.68 |
| K.S.U. Phi Gamma Theta | 860.00 |
| Kendel, Jim & Wanda | 140.00 |
| Korosa, Luan | 160.00 |
| Kronander, Bob | 200.00 |
| Lords House of Prayer | 350.00 |
| Louis & Partners Design | 1,303.00 |
| McGinnis, Cheryl | 120.00 |
| Nicols, Bonnie | 140.00 |
| Northeast Eye Surgeons | 8,049.32 |
| Northeast Eye Surgeons – Stow | 3,195.72 |
| Pfaff, James | 120.00 |
| Portage Community Health Resources | 1,766.68 |
| Sassaman, Kathy | 160.00 |
| Scott, Chuck | 160.00 |
| Shatrich, Harriet | 105.00 |

8

Case No. 2020-P-0006

| Shatrich, Stefanie | 105.00 |
|---|---|
| Toth, Bob | 15.00 |
| Toth, Louise | 15.00 |
| **TOTAL** | **22,271.40** |

{¶16} Specifically, Polen's testimony on direct examination was as follows:

**Q**. And at this time, describe what your client base was like and give us a few examples of your clients?

**A**. I had a very large client base and they were very loyal to me. I've had them forever. Like they just keep resigning with me every year.

**Q**. Go to tab 6 and take a look at tab 6 and let me know what that document is and if that reflects your client base or some of your clients.

**A**. Yeah. This is some of my clients. These are – the first one's like some of, my commercial ones. Second one is also commercial.

**Q**. Okay.

**A**. So those are commercial ones that deal with snowplowing and – yeah, these are ones that I definitely did snowplowing on.

**Q**. All right. Are these accurate numbers for what your sales were in 2016 during the months of February 1 through March 16?

**A**. Correct.

**Q**. So during that six-week or so time, $38,243.65 in sales to these customers?

**A**. Correct.

**Q**. Were these customers – were any of those customers repeat customers that you had more than just during 2016?

**A**. Yeah. All of them.

9

**Q**. Okay. And then going to this next page, it looks like we're extending this out rather than stopping at about the time you got your property back. This goes through June 1, 2016. Same customers?

**A**. Yeah, the same customers minus – well, Ramco, they dropped me because they're a very large –

**Q**. Well, let's get to that. This is not the year – this is not '17? This is '16?

**A**. Yep.

**Q**. And so $211,036.10 was your sales?

**A**. Correct.

**Q**. And based on your experience – and you had many of these customers repeatedly over the years?

**A**. Correct.

**Q**. Based on your experience running this company, what was your profit margin on sales?

**A**. It was around 40 percent.

**Q**. All right. So let's compare to – well, let's go down this list. What happened to Ramco in 2017? Did this dispute with Frank Shenigo affect your relationship with Ramco?

**A**. Yes, because Ramco is a very large company and they have trucks that need to be in and out every day. And I couldn't salt it, couldn't plow it, couldn't do anything with them. And they just asked me if I was able to take care of it and I said, no, I couldn't do it.

**Q**. What efforts did you make at that time, if any, or did Turfco make at, if any, to try to service your clients while you had no equipment?

**A**. A guy named David Yost from Yost Landscaping stepped up to the plate and took care of a few that were in the Kent area because that's where he plowed. So he plowed Northeast Eye and did the salting for me there, but he wasn't going out to Ramco. That's in Hudson. So I had to tell Rick

10

Malson, the owner, that I couldn't fulfill my contract. He was upset that I didn't show up one day.

**Q**. How about HM Miller?

**A**. Oh yeah. HM Miller, I just couldn't get out there. I had no dump trucks to do the work that he wanted me to do and –

**Q**. What did you do for him?

**A**. I did the snowplowing, plus I did like restoration lawns. So he does gas repair. And all winter long we would come and take the dirt off that was mounded up. Then we put topsoil down and seed it and straw it and it was all year.

**Q**. And the trucks you had to do this work were at Frank Shenigo's place?

**A**. Yes.

**Q**. Locked down?

**A**. Yes.

**Q**. Okay. Let's go to tab 7. And explain the first page at tab 7, the chart that's February 1 through March 15, explain what this is.

**A**. These are more snowplow accounts.

**Q**. Okay. But it's for a different year; correct?

**A**. Yep.

**Q**. And does this reflect the business that Turfco did during the period February 1, 2017, through March 15, 2017?

**A**. Yes.

**Q**. And Ramco is not on there. Is that because you lost Ramco in 2017?

**A**. Yes.

11

**Q**. Same questions with the second page. It looks like this is for the period of February 1, 2017 through June 1, 2017; is that correct?

**A**. Correct.

**Q**. Does this reflect the amount of business that Turfco did during that time?

**A**. Yes.

**Q**. And that's $22,271.40?

**A**. Correct.

**Q**. And as the owner and having been running the company, you attribute this – what do you attribute this decline in sales to?

**A**. It was just because I didn't have my equipment and just, you know, you lose the trust. Whenever you can't show up, people don't trust that you're going to be there. Your credibility is lost.

**Q**. What about when you got the equipment back in mid March?

**A**. Yeah.

**Q**. Why did – things did not just continue as usual?

**A**. Only with the ones that I didn't do snow removal with and the ones that weren't upset that I wasn't there to do their edging or their mulching right away. But most of it, it was just a bad relationship thing from then on.

**Q**. Explain to the – let's explain to the Court what do you do – I mean, I think of mulching and edging as a May, June thing, and maybe I'm behind the curve, but do you do that kind of stuff earlier than that?

**A**. Yeah. We do our pruning early and then we jump into mulching and edging right away because we have – our company, there's very few employees, we'll say, and a lot of work. So we try to get our edging out of the way and our mulching out of the way. And then we can get into our

12

landscape install, which is the grass and the plants and all that, installs, right when the prime time is. * * *

{¶17} Polen testified that Turfco eventually went out of business due to the loss of customer trust.

**Q.** What happened to the company?

**A.** Like it just – as soon as this happened, there was rumors saying that I was out of business. People were talking, because I didn't have my equipment. No one saw it around. This is small town stuff and stuff. I lost some business due to the fact that I couldn't get them salted in time or get the plow – get the snow plowed. And I just – they lost my – I lost my credibility. They lost their trust with me.

**Q.** And so the damages you're – Turfco is seeking is 40 percent of the difference in sales between 2016 – the six-month period – or five-month period in 2016 to 2017; is that right?

**A.** Correct.

**Q.** And we told the Court it was about $211,000.00 sales in that period through June of '16, and it was down to $22,000.00. If we deduct that out and apply 40 percent, that was what you would have expected your profit to be?

**A.** Yeah.

**Q.** And that would have been with gas paid, mulch paid, employees paid?

**A.** Correct.

{¶18} Based on Polen's testimony, the trial court determined Turfco's damages from lost profits to be $75,506.04, representing the difference between 2016 sales from February 1 through June 1 ($211,036.10) and 2017 sales for the same period ($22,271.40) multiplied by a 40 percent profit margin.

{¶19} We conclude that Polen was competent to testify as to Turfco's sales for 2016 and 2017 and as to the value of specific contracts. As the owner of the corporation

13

with few employees, Polen had personal knowledge of the business, its clients, and its sales. "'[M]ost courts have permitted the owner or officer of a business to testify to the value or projected profits of the business, without the necessity of qualifying the witness as an accountant, appraiser, or similar expert * * * because of the particularized knowledge that the witness has by virtue of his or her position in the business.'" *Raymond v. Raymond*, 10th Dist. Franklin No. 11AP-363, 2011-Ohio-6173, ¶ 11, quoting the Advisory Committee Notes for the 2000 Amendments to Fed.R.Evid. 701 (noting the federal rule parallels the Ohio rule); 1 McCormick, *Evidence*, Section 10 (8th Ed.Mosteller Ed.2020) ("lay employees of a business are often held to have enough 'personalized knowledge' of the business' operation to testify about such topics as the amount of its profits").

{¶20} We further conclude that the trial court's calculation of damages is not against the manifest weight of the evidence and, therefore, is supported by sufficient evidence. Polen's testimony and accounting records, without any evidence from Shenigo contradicting the testimony or challenging Polen's credibility in this regard, demonstrate Turfco's damages with reasonable certainty. The 2016 summaries list Turfco's repeat commercial snowplowing clients. Polen testified that Turfco's relationship with these repeat customers, including the corporation's two largest accounts, was negatively affected by the lockout in February 2017. The 2017 summaries corroborate that many of those repeat customers did not generate any sales income for Turfco through June 2017. Considering only those customers that generated income from February through June 2016 that did not generate any income for that same time period in 2017, the amount of lost profits actually amounts to $77,316.41:

14

| Customer | February 1 through June 1, 2016 |
|---|---:|
| Graphic Detail | 980.00 |
| HM Miller | 44,959.50 |
| K.S.U. Alpha Phi House Corp. | 3,461.28 |
| Lemasters, Craig & Lisa | 25,262.25 |
| McDougal, Shel | 4,058.00 |
| Paino Construction | 0.00 |
| Ramco | 114,570.00 |
| **TOTAL** | **193,291.03** |

The trial court arrived at the lesser and more accurate amount of $75,506.04 by including the income generated from the additional residential clients serviced in 2017, presumably due to the loss of certain commercial accounts.

{¶21} Shenigo's assignments of error are without merit. We note a slight calculation error, however, that requires modification of the award. The magistrate's decision omitted 40 cents from the 2017 income total. The trial court then used the magistrate's inaccurate calculation when it recalculated the profit margin. The difference amounts to 16 cents. We therefore modify the award in favor of Turfco to $75,505.88. The judgment of the Portage County Court of Common Pleas is affirmed as modified.

MARY JANE TRAPP, P.J., concurs,

MATT LYNCH, J., dissents with a Dissenting Opinion.

_____

MATT LYNCH, J., dissents with a Dissenting Opinion.

{¶22} Damages may be awarded for lost profits when the existence of lost profits and the amount thereof are established with reasonable certainty. *Gahanna v. Eastgate*

15

*Properties, Inc.*, 36 Ohio St.3d 65, 521 N.E.2d 814 (1988), syllabus. Lost profits may be established "with reasonable certainty through the use of such evidence as expert testimony, economic and financial data, market surveys and analyses, business records of similar enterprises, and any other relevant facts." *AGF, Inc. v. Great Lakes Heat Treating Co.*, 51 Ohio St.3d 177, 555 N.E.2d 634 (1990), paragraph three of the syllabus.

{¶23} In the present case, Turfco Landscaping's damage claims are based on faulty methodology and are unsupported by any documentary evidence. In two cases, Turfco established lost profits with arguable certainty. But even in these cases, the evidence is contradictory and remains unsupported. Accordingly, I respectfully dissent.

{¶24} The damage award affirmed by the majority was calculated by comparing a partial sampling of Turfco's sales from February 1 through June 1 in 2016 with a different partial sampling of Turfco's sales for the same period in 2017. It is presumed that the difference in sales is wholly attributable to the six-week lockout that occurred in February and March of 2017.

{¶25} The 2016 figures are based on the sales generated by 13 clients in an Income by Customer Summary prepared for trial. In no case are Turfco's figures established by company documents. The only actual evidence of damages is Polen's testimony which, however, depends on the prepared summaries.

{¶26} These 13 clients purportedly accounted for $211,036.10 in sales for the period from February 1 to June 1 in 2016. It must be emphasized that this Summary is partial and incomplete. Polen testified that it represented his "strictly commercial" clients despite individuals' names such as "Henry Wahner" and "McDougal, Shel" appearing on the list. Nor is the Summary comprehensive even with respect to commercial clients.

16

Polen testified there were others, such as Suffield Township, "which I don't see in here."

{¶27} The 2017 figures are based on the sales generated by 28 clients in another Customer Summary prepared for trial. According to Polen, these were his "residential" plowing accounts. Six of the clients from the 2016 Summary reappear in the 2017 Summary. Among the remaining 22 clients, there are commercial clients such as the "Lords House of Prayer" and "Louis & Partners Design" interspersed among the names of individuals. Like the 2016 Summary, the 2017 Summary is incomplete. When asked if there was other work or customers not reflected in the 2017 Summary, Polen responded: "Oh, jeez. I would have to have, like, the computer in front of me to look at it."

{¶28} It should be obvious that no reasonably certain figure for the change in Turfco's sales from 2016 to 2017 can be obtained by comparing sales for two random samplings of clients. Even presuming the accuracy of the figures contained in the Summaries, what evidentiary value is there in comparing a list of primarily commercial clients with a list of primarily residential clients? Such a methodology is nonsensical and cannot produce any reliable measure of Turfco's damages.

{¶29} Assuming, arguendo, that an accurate figure for the decline in Turfco's sales from 2016 to 2017 existed, there is no evidence to substantiate the claim that the decline was proximately caused by the 2017 lockout. Polen's testimony cannot support such a claim. He testified vaguely about "this is small town stuff" and "lost credibility." But only in the cases of Ramco and HM Miller did he expressly state: "I lost them because I couldn't fulfill their expectations for the month of February."

{¶30} The Summaries themselves attest that the difference in sales cannot be

17

solely attributed to business lost as a result of the lockout. Among the clients that appear in both the 2016 and 2017 Summaries, it should be noted that the income generated by Henry Wahner increased from $740 in 2016 to $1,000 in 2017; Hudson Presbyterian's sales decreased from $4,183.35 in 2016 to $3,346.68 in 2017; whereas sales for Northeast Eye Surgeons increased from $7,199.32 in 2016 to $8,049.32 in 2017. These are significant changes in sales that, based on the evidence in the record, had nothing to do with the 2017 lockout.

{¶31} There are still further deficiencies in the damage calculation based on a comparison of the 2016 and 2017 Summaries. Turfco's landscaping business encompassed a variety of services not all of which would have been affected by a lockout occurring in February and March 2017. Yet we have no testimony as to the nature of the services utilized by the various clients identified in the Summaries.

{¶32} Even in the case of Ramco, representing the single largest client purportedly lost as a result of the lockout, the evidence is equivocal rather than reasonably certain. Polen testified expressly that Turfco lost Ramco as a client as a result of not being able to fulfill its expectations "for the month of February." According to the sales Summary for February 1 through March 15, 2016, however, Ramco did not generate any sales during this period. In other words, Polen claims that Ramco required snow plowing services during the month of February, but the February sales report indicates that the Ramco account generated "0.00" in sales. After March 15, when plowing services would rarely be needed, Ramco generated the $144,507 in sales – representing well over half the purported commercial sales for 2016. If, as Polen testified, Turfco lost Ramco because it could not perform plowing services during the 2017 lockout, one would expect

18

Ramco to generate sales during the winter of 2016. But Turfco's own evidence does not indicate any sales generated by Ramco until after March 15 of that year.

{¶33} With respect to lost profits, it has been held: "More is required of the plaintiff than merely his assertion (either directly or through an expert witness) that he would have made a particular amount in profits. Unless the figure is substantiated by calculations based on facts available or in evidence, the courts will properly reject it as speculative or uncertain." (Citation omitted.) *Kinetico, Inc. v. Independent Ohio Nail Co.*, 19 Ohio App.3d 26, 30, 482 N.E.2d 1345 (8th Dist.1984); *Rhodes v. Rhodes Industries, Inc.*, 71 Ohio App.3d 797, 809, 595 N.E.2d 441 (8th Dist.1991) ("[t]here must be more than a conclusory statement as to the amount of lost profits"); *accord Matco Tools Corp. v. Urquhart*, 435 F.Supp.3d 802, 813 (N.D.Ohio 2020).

{¶34} That Turfco suffered actual damages as a result of the lockout is entirely probable. The award of damages in the present case, however, is speculative and uncertain. The figures contained in the sales Summaries are not based on facts in evidence. The procedure of comparing sales figures based on different client samplings is fundamentally flawed. The figures contained in the Summaries are inconsistent and even contradictory to Polen's testimony. Accordingly, Turfco has failed to demonstrate damages with reasonable certainty, and I would reverse the judgment of the trial court.

Case No. 2020-P-0006