[Cite as *Yagour Group, L.L.C. v. Ciptak*, 2024-Ohio-73.]

# COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

YAGOUR GROUP, LLC                           :
DBA PERFECTION LANDSCAPES,
                                            :
     Plaintiff-Appellee,                     No. 112846
                                            :
     v.                                 :

KEVIN CIPTAK, ET AL.,                       :

     Defendants-Appellants.              :

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** January 11, 2024

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Case No. CV-21-954274

---

### *Appearances:*

Argie, D'Amico & Vitantonio and George J. Argie, *for appellee.*

Fortney Law, LLC and Michael R. Fortney, *for appellant.*

ANITA LASTER MAYS, P.J.:

{¶ 1}  Defendant-appellant Kevin Ciptak appeals the trial court's judgment awarding plaintiff-appellee Yagour Group LLC dba Perfection Landscapes ("Perfection") $62,437 in damages on Perfection's claim for breach of contract following a bench trial.  Ciptak contends that the trial court's judgment should be

reversed because Perfection failed to present evidence it sustained any lost profits as a result of Ciptak's violation of the contract's noncompetition provisions. For the reasons that follow, we affirm the trial court.

**Factual Background and Procedural History**

{¶ 2} In July 2019, Ciptak entered into an "employment and noncompetition agreement" with Perfection, a landscape construction, installation, design, and services company (the "contract" or the "agreement"). Pursuant to the agreement, Ciptak agreed to provide "sales, project management, operations [and] accountant [sic] management" services for Perfection, and Perfection would pay him an annual salary of $65,000 plus 3 percent commission. The parties also agreed that Ciptak would receive a monthly stipend toward health insurance, a company vehicle, and paid vacation time and holidays. The contract included an "[e]xclusive [s]ervices and [b]usiness [c]onduct" provision (the "exclusive services provision"), which provided:

> The Employee promises and agrees that the Employer has the benefit of his/her exclusive services for which he/she was hired during their employment relationship. The Employee further promises and agrees to act in the spirit of cooperation in relating to other employees and to the Employer in order to promote the success and well-being of the Employer and its employees. The Employee further promises and agrees to refrain from taking any course of action intending or knowing it to be harmful to the interests of the Employer.

{¶ 3} The contract also included several noncompetition provisions (collectively, the "noncompetition agreement"), which provided in relevant part:

> **8. Noncompetition with the Employer.** The Employee agrees that for the duration of his/her employment by the Employer and for a

period of one (1) year from the termination of this Agreement for any reason, he/she will not engage in the business of Employer within the geographic areas that Employer conducts its business, in any capacity whatsoever, directly or indirectly, whether as an individual or as a partner, joint venturer, independent contractor, employee, agent or officer, director or shareholder of any corporation.

**9. <u>After Separation from the Employer</u>.** For a period of two (2) years after the termination of the employment relationship of the Employee's leaving the Employer for any reason, the Employee shall not directly or indirectly solicit anyone, for his/her benefit or that of another, who is a customer of the Employer or who was a customer of the Employer during the term of this Agreement, to leave the Employer and obtain similar services elsewhere, nor will the the Employee perform or offer to perform any services for any such person, unless he/she has received the express prior written consent, permission and approval of the Employer.

**10. <u>No Solicitation of Employer's Employees</u>.** The Employee hereby recogniz[es] that the Employer's independent contractors and personnel are its most significant asset and agrees that, for a period of two (2) years after leaving the Employer for any reason, he/she will not solicit any independent contractor or employee of the Employer to leave the Employer in order to join him/her or another business entity, whether or not he/she is associated or becomes associated with such entity, unless he/she first receives the express prior written consent, permission and approval of the Employer.

{¶ 4} In addition, the contract included a liquidated damages provision, providing specific remedies if Ciptak "violate[d] any of the terms" of the noncompetition agreement and "continue[d] to violate any of such provisions" after being "notified * * * to cease and desist such violations." The contract stated:

**11. <u>Agreed Remedies</u>.** In the event the Employee violates any of the terms and provisions set forth above in paragraph 8 through 10, inclusive, and continues to violate any of such provisions after the Employer has notified him/her to cease and desist such violations, the Employee understands and expressly agrees that the Employer may, at its sole option, elect to enforce any or all of the following remedies:

(a) The Employee consents to the entry of an injunction without contest if sought by the Employer to restrain the Employee from any further such violations;

(b) If the Employee violates the provisions of paragraph 8 or paragraph 9 above, the Employee agrees to pay the Employer as damages an amount equal to one hundred percent (100%) of the revenues Employee receives from competing with the Employer or providing services to customers of the Employer; and

(c) If the Employee violates the provisions of paragraph 10 above, the Employee agrees to pay the Employer as damages an amount equal to the total compensation and benefits earned by the solicited independent contractor or employee for the year prior to the date of his or her departure from the Employer.

{¶ 5} The contract also required Ciptak to reimburse Perfection for "all of its costs and expenses, including reasonable attorneys' fees, connected with enforcing" the noncompetition agreement.

{¶ 6} While he was employed by Perfection, Ciptak began operating his own landscaping business, doing various side jobs, for which he was compensated by his customers. On August 17, 2021, Ciptak resigned from Perfection.

{¶ 7} On October 13, 2021, Perfection filed suit against Ciptak and his company, Perfect Patio and Landscape, LLC ("Perfect Patio"), in the Cuyahoga County Court of Common Pleas, asserting a claim of breach of contract based on Ciptak's alleged violation of the noncompetition agreement. Perfection sought a temporary restraining order, preliminary and permanent injunctive relief, and to recover damages, attorney fees, and expenses incurred as result of Ciptak's alleged violation of the noncompetition agreement.

{¶ 8} On November 2, 2021, the parties filed an "agreed permanent injunction," pursuant to which Ciptak and Perfect Patio agreed not to engage in

business or solicit Perfection's customers, employees, or independent contractors in the geographic area and for the time periods specified in the injunction. Ciptak and Perfect Patio thereafter filed an answer to Perfection's complaint in which they denied the material allegations of the complaint and asserted various affirmative defenses.

{¶ 9} On May 10, 2023, the case proceeded to a bench trial on Perfection's breach-of-contract claim. In its opening statement, Perfection indicated that the evidence would show that Ciptak had breached the contract (including the exclusive services provision and the noncompetition agreement) by running his own side business while employed by Perfection, that Ciptak had "profited significantly" from his side business to the detriment of Perfection, and that Perfection had been damaged "to the tune of whatever one hundred perfect of the revenues we are able to establish through this trial." After Perfection gave its opening statement, Ciptak moved for a directed verdict under Civ.R. 50(A), arguing that the contract's liquidated damages provision was an unenforceable penalty and could not provide a basis for an award of damages to Perfection. The trial court denied the motion.

{¶ 10} Marcus Yagour ("Yagour") (the sole owner and president of Perfection), Yagour's father, Mark Yagour ("Mark") (Perfection's chief operating officer), and Ciptak testified at trial.

{¶ 11} Yagour testified that he had hired Ciptak in July 2019 to replace a key employee who had been running the construction side of the business. He indicated that Ciptak was "the perfect package" because he had previously run his own

landscaping business in the Akron area, had client contacts in the area, and could also do design work. Yagour testified that Ciptak's compensation and benefit package cost the company between $100,000 and $125,000 a year, depending on the commissions Ciptak earned. He stated that it was his expectation that Ciptak would devote his full time and attention to his employment at Perfection and indicated that Ciptak was required to sign a noncompetition agreement as a term of his employment because "[s]omebody in that type of role has access to customers, leads, pricing, all sorts of confidential information" and "to have somebody go out and do work competing with the company would be detrimental to the company." Yagour testified that Ciptak was "[b]asically, * * * a division manager of the construction side of Perfection" and that his job duties and responsibilities included "meeting with customers, selling the jobs, designing the jobs, project management, and operations."

{¶ 12} Ciptak testified that his role at Perfection was "basic design and sales," i.e., that he would receive leads from the company, "execute" those leads by calling or meeting with clients regarding potential jobs, and prepare design proposals to "try and sell the job." He confirmed that he had signed and agreed to the terms of the contract, including the noncompetition agreement. He testified that his job duties at Perfection included developing business for Perfection, following up on leads, preparing proposals and contracts, and overseeing jobs to completion. Ciptak stated that he had "no set hours" but that "[t]he discussion was Monday

through Friday" and that if work was behind schedule, he would also work on Saturdays.

{¶ 13} Ciptak admitted that although, under the terms of the contract, he was not permitted to operate his own business while working for Perfection, he, nevertheless, performed "random side work for people on the weekends," i.e., landscaping work for family, friends, or "existing clientele" that he had "from being in business for 20 some years." Ciptak testified that he "probably did about * * * a dozen jobs" on the side (the "side work" or "side jobs") while he was working for Perfection. Ciptak stated that this side work included designing patios, decks, landscape design, and landscape installation, i.e., "pretty much" the same type of work he did while employed by Perfection. Ciptak stated that, in his role at Perfection, he had full authority to decide whether Perfection would take on a particular job or decline it.

{¶ 14} Ciptak claimed that "Perfection could not do the work" he took on as side work because Perfection was "too busy," was "swamped," "[t]he schedule was booked," and Perfection had a "backlog worth of work." He testified that Perfection had "more work than we knew what to do with" and that Perfection "didn't have the manpower" even to do the jobs he had scheduled. Ciptak explained that if a lead came in and he decided that Perfection would not take on the job, "[i]nstead of letting that job go somewhere else," he "turn[ed] around and did a job over the weekend or something." He stated that he operated his side jobs out of his residence, that he used his own tools on these jobs (but acknowledged that

Perfection paid or reimbursed him for the licensing fees on the landscape design software he used), and that he hired subcontractors (including a subcontractor who refused to work for Perfection), "friends that did work in the landscaping industry field," and other Perfection employees to work on his side jobs.[1] Ciptak testified that he did side work on the weekends or "[m]aybe the evenings," but other than answering a phone call if someone called him, he "would never mix company time" with his side jobs. He claimed that he "never let the [side] work interfere with [his] work at Perfection."

{¶ 15} When responding to discovery requests, Ciptak created a list of the side jobs he performed while working at Perfection, identifying the date, property owner, and address for each side job, providing a brief description of the job, and listing the "job price" or revenue and "estimated profit" for the job ("exhibit No. 6"). Ciptak testified regarding exhibit No. 6 at trial, indicated that it was "true and accurate," and stated that his "estimated profit" identified on exhibit No. 6 was "what was left at the bottom line after [he] paid employees and [for] materials." He indicated that he maintained a file for each job containing the contract and receipts,

---

[1] Yagour testified that, at that time, Perfection had noncompetition agreements with only Ciptak, Ciptak's predecessor, and Perfection's office manager because they had access to proprietary information. He stated that other employees who did not have contracts, e.g., laborers and foremen, were permitted to do side work on evenings or weekends. Yagour testified that sometimes Perfection employees worked on Saturdays but that, unless a day of work was missed during the week due to weather, Ciptak had said he did "not want the guys to work on Saturdays and Sundays because * * * they needed days off to rest." However, Ciptak then hired Perfection employees to work on the weekends on his own jobs.

that he "kept a running list" of his costs and expenses for each job, and that he subtracted his costs and expenses from the contract price to determine his "estimated profit." Ciptak stated that his profit was "estimated" because he "may be off [by] dollars and cents." During cross-examination, after being shown evidence of additional payments he received that were not reflected in the figures listed on exhibit No. 6, Ciptak adjusted some of the figures listed in exhibit No. 6. He estimated that the revenues generated by the side jobs he performed while working for Perfection totaled over $240,000 and that the profits he realized from these side jobs totaled over $60,000.[2] Ciptak stated that a "[p]retty accurate" estimate was that he earned "[p]robably 20, 25 percent" profit on side jobs because he had "other guys do most of the work" and had to pay them for their services.

{¶ 16} Ciptak testified that with the exception of "grill items," which he subcontracted out to "[a] friend * * * , maybe," the work he performed as side work was the same type of work done by Perfection and were jobs Perfection "could have done." He further testified that Perfection could have also had employees work on the weekends but that he "didn't make that call."

{¶ 17} Ciptak testified that he and Yagour "had conversations" about his side work on "three or four different occasions." He claimed that it was "no secret" that

---

[2] The trial court found that "Ciptak's total revenues on all of the above jobs was $240,066" and that "Ciptak's total profits on all of the above jobs was reasonably estimated at $62,437." Having reviewed exhibit No. 6 and Ciptak's trial testimony, it is not entirely clear to this court exactly how the trial court calculated these sums. However, because Ciptak does not challenge these findings on appeal, we assume they are correct and do not further address the issue here.

he was doing side work and making a profit and that Yagour knew it and had "[n]o problems, no issues at all with it." However, Ciptak admitted that he did not tell Yagour about the specific jobs listed on exhibit No. 6 and did not seek his consent to perform those side jobs. Ciptak claimed that "[i]t was okay for people * * * at that company [to] call off work and do side work on their own time frame, and there would be no problem at all." He stated that he did not inform Yagour that he was using Perfection employees to work on his side jobs because Yagour "knew about it already."

{¶ 18} Yagour testified that in late 2020 he began to suspect that Ciptak was doing business on the side after another Perfection employee showed him GPS records that indicated Ciptak's work truck was in an area in which Perfection did not then have a job. Yagour stated that he called Ciptak and asked him what was going on. According to Yagour, Ciptak informed him that he was doing warranty repair work for one of his former clients. Yagour told Ciptak that, in the future, such work would need to go through Perfection and that Perfection would perform the work for Ciptak at cost. Yagour testified that he later learned it was not, in fact, a warranty repair on which Ciptak had been working.

{¶ 19} Yagour testified that he next became suspicious of Ciptak performing side work in late February or early March 2021 when he overheard several Perfection employees talking about working on the weekend for Ciptak. Yagour stated that he, once again, contacted Ciptak and discussed the issue. According to Yagour, Ciptak informed him that he was either doing work for a family member or

a warranty repair for one of his former clients. Yagour testified that he reminded Ciptak that he had a noncompetition agreement, read the contract language to Ciptak that precluded him from competing with Perfection, and reiterated that Perfection could perform work for Ciptak or his family members at a discounted rate, but that the work had to go through Perfection. Ciptak testified that he had a "sit-down meeting" with Yagour and others in February 2021 where he "cleared the air" and "explained to everybody that [he] did side work on the weekend." He stated that, following that disclosure, "[e]verything was fine."

{¶ 20} Yagour testified that, in May 2021, he became concerned that Ciptak might not be devoting sufficient time and attention to Perfection's business when (1) GPS records showed that Ciptak's work truck "wouldn't move for two days at a time," then "when it did, sometimes it would be gone for an hour or two, and then parked for 24, 36 hours or more without leaving" and (2) a review of jobs quoted showed a significant decrease in the number of jobs quoted in 2021 as compared with the number of jobs quoted in 2020. Yagour explained that Ciptak's role was "to go and quote jobs, look at jobs, meet customers, * * * project manage the jobs to make sure they are getting done properly and answer questions for crews and make sure that those crews are working at a good pace to get the job done" and stated that if they did not "put out enough quotes," they were not "going to get enough work to be able to do."

{¶ 21} Yagour and Mark met with Ciptak to discuss Ciptak's job performance and their concern that he was performing prohibited side work. Mark testified that,

during the meeting, Ciptak stated that he had been working on a side job for a friend. Ciptak testified that he discussed his side work with the men "thoroughly," explaining that he "had a lot of leads" and was just "doing some [side] work to earn a little bit of extra money." Ciptak denied that quotes or sales were down in 2021 as compared with 2020.

{¶ 22} Yagour testified that Ciptak never made him aware of any of the jobs identified in exhibit No. 6, that he never offered Perfection any of these jobs, and that Yagour did not consent to Ciptak doing these jobs as side work.

{¶ 23} Yagour testified that, based on Ciptak's descriptions of the jobs and their costs, the jobs identified in exhibit No. 6 were jobs that Perfection "[a]bsolutely" could have performed. Although he acknowledged that Perfection, "[a]s in any industry," had manpower issues "from time to time" in 2020 and 2021, he pointed out that Ciptak used Perfection's employees and subcontractors to work on the jobs. Yagour testified that the jobs were located in geographic areas in which Perfection had previously worked (or in which Perfection was prepared to work, given the scope of work and the job price) or involved design work that could have been done from the office. With respect to the grill work on one of the jobs, Yagour stated that that work was originally included in a quote for patio and landscaping work Perfection had developed for that client, but that the client decided to postpone the grill work. He indicated that Perfection could have either performed the grill work or subcontracted it out — like Ciptak did. With respect to another job identified on exhibit No. 6, Yagour testified that after Ciptak left the company, he

discovered that the job had been quoted using Perfection's landscape software and that Ciptak had sent a quote for the job to the client on Perfection's letterhead.

{¶ 24} Mark testified that the final straw occurred in August 2021, when Yagour learned, based on a review of GPS data, that "one of the main lead guys" had left a job he was working on for Perfection because Ciptak had directed him to come to his house to deliver something to, or do something at, his house, which Mark considered to be "[v]ery inappropriate." Ciptak testified that he had directed one of Perfection's foremen to come over to his house to assist him with a bid on a design project, "to help [him] out with labor things," and to bring a sprayer to spray weeds in his yard. Mark testified that he and Yagour again confronted Ciptak about doing side jobs in violation of the noncompetition agreement. Following a "heated argument," Ciptak quit. Yagour testified that after Ciptak left Perfection, Perfection discovered the "full magnitude" of the side business Ciptak had run while working for Perfection.

{¶ 25} On May 19, 2023, the trial court issued a written decision, finding in favor of Perfection on its breach-of-contract claim against Ciptak and awarding Perfection $62,437 in damages, plus costs and postjudgment interest against Ciptak.[3] The trial court found that while employed by Perfection, Ciptak had "operated his own side business," "perform[ing] work of a type that Plaintiff performed and within the geographic area" and that he had "often" used Perfection's

---

[3] The trial court found in favor of Perfect Patio on Perfection's claim against Perfect Patio and dismissed it with prejudice.

employees to do the work. The trial court concluded that this "side work" violated the noncompetition agreement, that the contract's agreed damages provision was "an unenforceable penalty" and that the "proper measure" of Perfection's lost profits under the circumstances were "the illicit gains of Ciptak," which represented the profits Perfection "could have had if Ciptak were not taking the jobs for himself." The trial court further found that Ciptak had "reasonably estimated" his profits on these jobs at $62,437, and that "[t]he profits lost to [Perfection] by the jobs taken by Ciptak" were, therefore, "reasonably calculated to be $62,437." The trial court noted that the contract provided for an award of attorney fees and directed Perfection to file a motion for attorney fees and supporting affidavit within 14 days.

{¶ 26} On May 24, 2023, Perfection filed a motion for attorney fees and costs with a supporting affidavit, requesting an award of $51,712.50 in attorney fees and $2,521.38 in litigation expenses. Ciptak did not oppose the motion.

{¶ 27} On June 12, 2023, Ciptak filed a notice of appeal, appealing the trial court's May 19, 2023 judgment.

{¶ 28} On July 13, 2023, while the appeal was pending, the trial court issued a journal entry granting Perfection's postjudgment motion for attorney fees and costs in part and denying it in part. Concluding that certain of the hours billed were unnecessary and excessive and included items as to which Perfection did not prevail or that were resolved by agreement, the trial court awarded Perfection $20,000 in attorney fees and $2,521.38 in litigation expenses, plus postjudgment interest.

{¶ 29} On August 31, 2023, this court — in order to remove the appearance of any jurisdictional impediment[4] — sua sponte remanded the case to the trial court with instructions to reenter judgment on Perfection's motion for attorney fees and costs. On September 21, 2023, in response to the remand order, the trial court again issued a judgment entry awarding Perfection $20,000 in attorney fees and $2,521.38 in litigation expenses (collectively, "attorney fee award"), plus postjudgment interest.

{¶ 30} Ciptak did not appeal the attorney fee award. He did not file a new notice of appeal from the trial court's July 13, 2023 or September 21, 2023 journal entries and did not move to amend his prior notice of appeal to include an appeal of the trial court's attorney fee award.

**Law and Analysis**

### Absence of Assignments of Error

{¶ 31} Before considering the merits of Ciptak's arguments, we must first address a significant deficiency in Ciptak's appellate brief. Ciptak's appellate brief contains no assignments of error. Pursuant to App.R. 16(A)(3), an appellant's brief must contain "[a] statement of the assignments of error presented for review, with reference to the place in the record where each error is reflected." Assignments of

---

[4] Pursuant to App.R. 4(B)(2)(e), the timely filing of a postjudgment motion for attorney fees stays the period in which a party has to appeal. If an appeal is filed from an otherwise final order but before the trial court has ruled on such a motion, the appellate court may stay appellate proceedings and remand the case to the trial court to issue a ruling on the motion. App.R. 4(B)(2). A party wishing to appeal this ruling may then follow the procedure in App.R. 4(B)(2) to do so.

error are critical to an appeal because an appellate court "shall * * * [d]etermine [an] appeal on its merits *on the assignments of error set forth in the briefs under App.R. 16*, the record on appeal under App.R. 9, and, unless waived, the oral argument under App.R. 21." (Emphasis added.) App.R. 12(A)(1)(b). Appellate courts rule on assignments of error, "'not mere arguments.'" *Hamid v. Univ. Manors, Ltd.*, 10th Dist. Franklin No. 20AP-74, 2021-Ohio-2115, ¶ 16, quoting *Huntington Natl. Bank v. Burda*, 10th Dist. Franklin No. 08AP-658, 2009-Ohio-1752, ¶ 21; *see also Williams v. Barrick*, 10th Dist. Franklin No. 08AP-133, 2008-Ohio-4592, ¶ 28 (appellate courts "rule[] on assignments of error only, and will not address mere arguments"). Therefore, without assignments of error, an appellate court arguably has nothing to review. *See, e.g., Hamid* at ¶ 16 ("Because appellant has failed to set forth any assignments of error for this court's review, it is not necessary for this court to address appellant's arguments in order to affirm the trial court's judgment."), citing *Luke v. Roubanes*, 2018-Ohio-1065, 109 N.E.3d 671, ¶ 16 (10th Dist.).

{¶ 32} Appellate courts have discretion to dismiss appeals that fail to set forth assignments of error. *See, e.g., Hamid* at ¶ 17; *State v. Oberly*, 3d Dist. Logan Nos. 8-22-14, 8-22-15, 8-22-16, and 8-22-17, 2023-Ohio-179, ¶ 14; *Summers v. Naumov*, 10th Dist. Franklin No. 20AP-565, 2021-Ohio-2323, ¶ 7; *CitiMortgage, Inc. v. Asamoah*, 10th Dist. Franklin No. 12AP-212, 2012-Ohio-4422, ¶ 5.

{¶ 33} Although Ciptak failed to set forth any assignments of error in his appellate brief, he did present the following four "issues for review":

FIRST ISSUE PRESENTED FOR REVIEW:

Is the proper test for breach of a non-competition agreement the lost profits of the plaintiff, or the illicit gains of the defendant?

SECOND ISSUE PRESENTED FOR REVIEW:
Can a defendant be liable for breach of a non-competition agreement when the defendant presents unrebutted evidence that plaintiff was too busy to perform the work in question and the plaintiff refuses to present any evidence of plaintiff's lost profits?

THIRD ISSUE PRESENTED FOR REVIEW:
Can a defendant be liable for breach of a non-competition agreement when the only evidence of lost profits consists of defendants' alleged profits, and those alleged profits are speculative and not proved with reasonable certainty?

FOURTH ISSUE PRESENTED FOR REVIEW:
Can a defendant be liable for attorney's fees when the plaintiff fails to prove all elements of its breach of contract claim and thus failed to enforce its contract rights?

{¶ 34} Recognizing that there is a preference for resolving cases on the merits, even if we were to treat Ciptak's "issues presented for review" as assignments of error or were to otherwise consider Ciptak's arguments, for the reasons set forth below, we would find no basis for reversing the trial court's judgment.

**Standard of Review**

{¶ 35} In a civil appeal from a bench trial, we generally review the trial court's judgment under a manifest weight standard of review. *See, e.g., Richard v. Carmax*, 8th Dist. Cuyahoga No. 112108, 2023-Ohio-2066, ¶ 14; *Huntington Natl. Bank v. Slodov*, 8th Dist. Cuyahoga No. 110113, 2021-Ohio-2932, ¶ 47. As the Ohio Supreme Court explained in *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517:

"Weight of the evidence concerns 'the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the [trier of fact] that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief.'"

(Emphasis deleted.) *Id.* at ¶ 12, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting *Black's Law Dictionary* 1594 (6th Ed.1990). In assessing whether a verdict is against the manifest weight of the evidence, we examine the entire record, weigh the evidence and all reasonable inferences, consider the witnesses' credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the verdict must be overturned and a new trial ordered. *Richard* at ¶ 14, citing *Sonis v. Rasner*, 2015-Ohio-3028, 39 N.E.3d 871, ¶ 53 (8th Dist.). A verdict supported by some competent, credible evidence going to all the essential elements of the case must not be reversed as being against the manifest weight of the evidence. *Gerston v. Parma VTA, L.L.C.*, 8th Dist. Cuyahoga No. 105572, 2018-Ohio-2185, ¶ 57; *see also Patel v. Strategic Group, L.L.C.*, 2020-Ohio-4990, 161 N.E.3d 42, ¶ 20 (8th Dist.) ("'[F]ollowing a bench trial, a reviewing court will generally uphold a trial court's judgment as long as the manifest weight of the evidence supports it — that is, as long as "some" competent and credible evidence supports it.'"), quoting *MRI Software, L.L.C. v. W. Oaks Mall FL, L.L.C.,* 2018-Ohio-2190, 116 N.E.3d 694, ¶ 12 (8th Dist.). Issues of law are reviewed de novo. *See, e.g.,*

*Johnson v. Abdullah*, 166 Ohio St.3d 427, 2021-Ohio-3304, 187 N.E.3d 463, ¶ 38; *Hudson v. Petrosurance, Inc.*, 127 Ohio St.3d 54, 2010-Ohio-4505, 936 N.E.2d 481, ¶ 30; *United States Fire Ins. v. Am. Bonding Co.*, 1st Dist. Hamilton Nos. C-160307 and C-160317, 2016-Ohio-7968, ¶ 16-17.

**Evidence of Lost Profits Arising from Breach of Noncompetition Agreement**

{¶ 36} Ciptak's first three "issues presented" relate to the trial court's findings related to damages. Ciptak does not challenge the trial court's finding that he violated the noncompetition agreement. Rather, he contends that the trial court's judgment should be reversed because Perfection failed to present evidence that it sustained any lost profits as a result of Ciptak's breach of the noncompetition agreement. Specifically, Ciptak argues that (1) under Ohio law, Perfection could recover only its own lost profits (if any) — not the "illicit gains of the defendant" — resulting from Ciptak's breach of the noncompetition agreement, (2) given Ciptak's testimony that Perfection was "too busy" to perform the jobs he did on the side, the only conclusion that could be reasonably drawn from the evidence was that Perfection was not damaged by Ciptak's breach of the noncompetition agreement, and (3) the trial court "should not have awarded any lost profit damages to Perfection" because Perfection "did not provide any actual evidence" of its lost profits and, therefore, did not prove the existence and amount of lost profits with reasonable certainty. Perfection responds that (1) the "illicit gains" Ciptak realized from his side work — established by Ciptak's trial testimony and exhibit No. 6 —

were "precisely the same as the 'profits' that were lost by Perfection" and "cannot be distinguished * * * by any rational argument," (2) these gains were a proper measure of Perfection's damages based on the evidence presented, and (3) the trial court's "final damages figure" was "firmly grounded in the undisputed facts of the case and in Ciptak's own testimony and admissions" and there was "no speculation or uncertainty about the numbers."

{¶ 37} To recover on a breach-of-contract claim, the plaintiff must prove, by a preponderance of the evidence: (1) the existence of a contract, (2) performance by the plaintiff, (3) breach by the defendant, and (4) damage or loss to the plaintiff resulting from the breach. *Reynolds v. Kamm*, 8th Dist. Cuyahoga No. 112500, 2023-Ohio-3797, ¶ 17, citing *Re/Max Crossroads Props. v. Roberts*, 8th Dist. Cuyahoga No. 99537, 2013-Ohio-5575, ¶ 11; *Skoda Minotti Co. v. Kent*, 8th Dist. Cuyahoga No. 111227, 2022-Ohio-3237, ¶ 14.

{¶ 38} "With the exception of nominal damages, '[d]amages are not awarded for a mere breach of contract; the amount of damages awarded must correspond to injuries resulting from the breach.'" *Claris, Ltd. v. Hotel Dev. Servs., LLC*, 2018-Ohio-2602, 104 N.E.3d 1076, ¶ 28 (10th Dist.), quoting *Textron Fin. Corp. v. Nationwide Mut. Ins. Co.*, 115 Ohio App.3d 137, 144, 684 N.E.2d 1261 (9th Dist.1996); *see also Concrete Creations & Landscape Design LLC v. Wilkinson*, 7th Dist. Carroll No. 20 CA 0946, 2021-Ohio-2508, ¶ 128 ("Where a breach of contract was proven at trial, but the evidence fails to sufficiently establish actual damages or fails to sufficiently establish the extent of the plaintiff's loss, the court may award

nominal damages. * * * Likewise, where the plaintiff alleges lost profits as a result of a non-compete clause violation but the amount of profits lost was not demonstrated due to the lack of proof on the elements * * *, then a small sum can be awarded as nominal damages.") (Emphasis deleted.).

{¶ 39} In cases involving breach of a noncompetition agreement, "the usual measure of damages is lost profits." *Briggs v. GLA Water Mgt.*, 6th Dist. Wood Nos. WD-12-062 and WD-12-063, 2014-Ohio-1551, ¶ 30; *see also Concrete Creations* at ¶ 122; *Ginn v. Stonecreek Dental Care*, 12th Dist. Fayette Nos. CA2015-01-001 and CA2015-01-002, 2015-Ohio-4452, ¶ 18; *Yardmaster Inc. v. Orris*, 11th Dist. Lake No. 9-305, 1984 Ohio App. LEXIS 10194, 4-5 (June 29, 1984). Generally, a plaintiff may recover lost profits as damages in a breach of contract action if: "(1) profits were within the contemplation of the parties at the time the contract was made, (2) the loss of profits is the probable result of the breach of contract, and (3) the profits are not remote and speculative and may be shown with reasonable certainty." *Charles R. Combs Trucking, Inc. v. Internatl. Harvester Co.*, 12 Ohio St.3d 241, 466 N.E.2d 883 (1984), paragraph two of the syllabus. Both the existence and amount of the lost profits must be established with reasonable certainty. *Gahanna v. Eastgate Props. Inc.*, 36 Ohio St.3d 65, 68, 521 N.E.2d 814 (1988). The determination of the existence and amount of lost profits is a question of fact. *Tackle Constr. Group, LLC v. Pedtke Ents., Inc.*, 2018-Ohio-1859, 113 N.E.3d 980, ¶ 22 (2d Dist.); *Kosier v. DeRosa*, 169 Ohio App.3d 150, 2006-Ohio-5114, 862 N.E.2d 159, ¶ 33 (6th Dist.).

{¶ 40} A plaintiff "cannot just demand amounts [as damages] because they seem fair to that party." *Concrete Creations* at ¶ 106. A plaintiff claiming lost profits in a breach-of-contract action must establish both "'what he would have received from the performance so prevented'" and "'what such performance would have cost him (or the value to him of relief therefrom).'" *Id.* at ¶ 98, quoting *Digital & Analog Design Corp. v. N. Supply Co.*, 44 Ohio St.3d 36, 40, 540 N.E.2d 1358 (1989); *Am. Logistics Group, Inc. v. Weinpert*, 8th Dist. Cuyahoga No. 85041, 2005-Ohio-4809, ¶ 23.

{¶ 41} "'The general rule regarding damages in civil cases is that they must be proven with certainty, but the amount may be reasonably estimated.'" *Tackle Constr.* at ¶ 22, quoting *TJX Cos., Inc. v. Hall*, 183 Ohio App.3d 236, 2009-Ohio-3372, 916 N.E.2d 862, ¶ 32 (8th Dist.). "'Damages are not rendered uncertain because they cannot be calculated with absolute exactness. It is sufficient if a reasonable basis of computation is afforded, although the result be only approximate.'" *TJX* at ¶ 32, quoting *Palmer v. Connecticut Ry. & Lighting Co.*, 311 U.S. 544, 559-560, 61 S.Ct. 379, 85 L.Ed. 336 (1941).

{¶ 42} In other words, although lost profits need not be proven with "mathematical precision," "'the evidence and theory of the case must provide the finder of fact with known, reliable factors that can reasonably guide the computation of damages'" so that they can be reasonably estimated. *Turfco Landscaping, Inc. v. Shenigo*, 11th Dist. Portage No. 2020-P-0006, 2021-Ohio-4259, ¶ 10, quoting *Carey v. Down River Specialties, Inc.*, 8th Dist. Cuyahoga No. 103595, 2016-Ohio-4864,

¶ 29. There must be more than a conclusory statement as to the amount of lost profits. *Rhodes v. Rhodes Industries, Inc.*, 71 Ohio App.3d 797, 809, 595 N.E.2d 441 (8th Dist.1991), citing *Kinetico, Inc. v. Indep. Ohio Nail Co.*, 19 Ohio App.3d 26, 30-31, 482 N.E.2d 1345 (8th Dist.1984). "An explanation of how that sum was determined is required. Lost profits must be substantiated by calculations based on facts available or in evidence, otherwise they are speculative and uncertain." *Rhodes* at 809; *see also Sutherland v. Gaylor*, 10th Dist. Franklin No. 20AP-257, 2021-Ohio-1941, ¶ 33. Damages that are speculative are not recoverable. *Turfco* at ¶ 10

{¶ 43} This case came down to a credibility determination. There was no dispute that Ciptak performed side work in violation of the noncompetition agreement. What was in dispute was whether Perfection had the capacity to perform the side work Ciptak undertook in violation of the noncompetition agreement, i.e., whether Ciptak diverted work that could have been performed by Perfection to his own side business. Ciptak testified that Perfection's schedule was so full it could not have performed the additional work and that at least one of the subcontractors he used to perform the side work would not work for Perfection. Contrary to Ciptak's assertion, however, this testimony was not "unrebutted" at trial.

{¶ 44} Yagour testified that, based on Ciptak's descriptions of the jobs listed on exhibit No. 6, if Ciptak had given Perfection the opportunity to perform the jobs on exhibit No. 6, Perfection "[a]bsolutely" could have and would have performed that work and earned the resulting profit. It was for the trial court, as the trier of fact, to determine whose testimony was more credible.

{¶ 45} Based on the record before us, we cannot say that the trial court's decision to credit Yagour's testimony over Ciptak's testimony was unreasonable. It was undisputed that Ciptak never told Yagour about any of the jobs listed on exhibit No. 6. In its findings, the trial court noted that although Ciptak testified, generally, that "his side business was for friends, family, or warranty work," he did not testify that any of the specific jobs identified in exhibit No. 6 were for friends or family or involved warranty work. The trial court also specifically noted that although Ciptak claimed that Perfection was "too booked" to do any of those jobs, he "provided no other evidence to support this assertion."

{¶ 46} With respect to the evidentiary basis underlying the trial court's lost profit calculation and damages award, the record reflects that "the evidence and theory of the case" provided the trial court "'with known, reliable factors'" that "'reasonably guide[d] the computation of damages'" and provided a reasonable estimation of Perfection's lost profits. *Turfco*, 2021-Ohio-4259, at ¶ 10, quoting *Carey*, 2016-Ohio-4864, at ¶ 29.

{¶ 47} The trial court's damages award, $62,437, was based on Ciptak's calculations and testimony regarding the profits he realized from the jobs identified on exhibit No. 6, i.e., "Ciptak's total profits." Based on his review of the contract price, customers' payments, and receipts for his expenses, Ciptak calculated the profit he earned on each of these side jobs and totaled them. Ciptak has not challenged the accuracy of the trial court's finding that his "total profits" on the side work was "reasonably estimated at $62,437."

{¶ 48} The trial court did not simply award Perfection "the amount of Ciptak's illicit gains" as damages, as Ciptak claims. Rather, the trial court determined that, under the particular, unique facts and circumstances here, "Ciptak's total profits" from the jobs on exhibit No. 6 "represent[ed] profits [Perfection] could have had if Ciptak were not taking the jobs for himself" and was, therefore, a reasonable estimation of Perfection's lost profits resulting from Ciptak's breach of the noncompetition agreement. The trial court found: "The profits lost to [Perfection] by the jobs taken by Ciptak are reasonably calculated to be $62,437."

{¶ 49} Based on the evidence presented at trial, the trial court reasonably inferred that, had the work identified in exhibit No. 6 gone to Perfection as contemplated under the contract (instead of to Ciptak), Perfection would have realized approximately the same profit on those jobs as Ciptak realized from those jobs. Ciptak prepared Perfection's job bids and estimates, staffed Perfection's jobs, and managed Perfection's jobs to completion. The side work involved the same type of work Perfection performed, in the same geographic area, in the same time frame, and was performed, at least in part, using Perfection's employees and subcontractors. There is nothing in the record to suggest that Ciptak's labor and material costs were materially lower than what Perfection's costs would have been if Perfection had taken on and completed those projects (which would have been priced, staffed, and managed by Ciptak). The trial court's determination that Perfection was damaged as a result of Ciptak's breach of the noncompetition agreement and that the evidence of "Ciptak's total profits" was a reasonable means

of calculating Perfection's lost profits from Ciptak's breach of the noncompetition agreement was supported by competent, credible evidence and was not against the manifest weight of the evidence.

{¶ 50} Accordingly, Ciptak's first three "issues presented" are meritless and overruled.

**Attorney Fee Award**

{¶ 51} In its fourth "issue presented," Ciptak asserts that "[i]f this Court reverses the Trial Court's May 19, 2023 Order, the award of attorney fees against Ciptak should also be reversed." Even assuming we could consider the issue given that Ciptak did not appeal the trial court's attorney fee award, because we have rejected Ciptak's other arguments, Ciptak's fourth "issue presented" is likewise meritless and overruled.

{¶ 52} Judgment affirmed.

It is ordered that appellee recover from appellant the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the Cuyahoga County Court of Common Pleas to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
ANITA LASTER MAYS, PRESIDING JUDGE

KATHLEEN ANN KEOUGH, A.J., and
MICHAEL JOHN RYAN, J., CONCUR