[Cite as *GROB Sys., Inc. v. McDermott*, 2024-Ohio-1734.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## HANCOCK COUNTY

GROB SYSTEMS, INC.,

    PLAINTIFF-APPELLANT,          CASE NO. 5-23-44

  v.

LOGAN McDERMOTT,               O P I N I O N

    DEFENDANT-APPELLEE.

**Appeal from Hancock County Common Pleas Court**
**Trial Court No. 2021-CV-163**

**Judgment Affirmed**

**Date of Decision:  May 6, 2024**

**APPEARANCES:**

    *Mark S. Barnes* **for Appellant**

    *Jason N. Flower* **for Appellee**

**WALDICK, J.**

{¶1} Plaintiff-appellant, GROB Systems, Inc. ("GROB"), brings this appeal from the September 18, 2023, judgment of the Hancock County Common Pleas Court awarding GROB damages for breach of contract by defendant-appellee, Logan McDermott ("McDermott"). On appeal, GROB argues that the trial court erred by employing a pro-rata formula when determining damages in this matter. For the reasons that follow, we affirm the judgment of the trial court.

*Background*

{¶2} GROB is an engineering company that builds automation systems. In order to fill its needs for skilled labor, GROB utilizes an apprenticeship program to recruit, educate, and train employees. Generally, the apprenticeship requires an individual to "make their services available solely to GROB for a period of 4-years."[1] (Doc. No. 10, Ex. 1). In exchange for the 4 years of service, GROB paid the apprentices and agreed to provide practical training and specialized training. In addition, GROB also paid tuition for the apprentices to earn an associate's degree.

---

[1] The full provision in the contract reads as follows:

> 4. As a condition of being selected to participate in the Apprenticeship, the Apprentice agrees to make their services available solely to GROB for a period of 4-years. The 4-year agreement begins on the date set forth in line item 2, (two years of Practical Training and two years for Specialized Training). Apprentice and GROB agree that the Apprentice's agreement to make themselves available to GROB for 4-years is not an agreement by GROB to employ Apprentice for the entire four-year period or to permit Apprentice to participate in the Practical or Specialized training for 4-years. Should GROB, at any time, determine that the trainee is not meeting GROB expectations the relationship between GROB and the Apprentice will be terminated.

{¶3} On June 5, 2017, McDermott became part of GROB's apprenticeship program. McDermott was a slightly atypical candidate because he had already completed a year of college, whereas most of the other apprentices had not. Regardless, McDermott signed the apprenticeship agreement with GROB, agreeing to make himself available solely to GROB for 4 years from the June 5, 2017 date. The agreement McDermott signed contained the following language related to leaving prior to the completion of the program:

> 14. Should the Apprentice choose to end his/her employment before the completion of the Practical Training period or the subsequent 2-year Specialized Training period, Apprentice agrees to fully reimburse GROB for all cost [sic] incurred on behalf of the Apprentice, during his/her participation in the apprentice program. Reimbursement, estimated cost of **$25,000**, will be paid to GROB within the next 3-months following the employment separation. This apprentice agreement is not a guarantee of permanent or continued employment. The Apprentice's employment may be terminated at will.

(Bold in original); (*Id.*).

{¶4} For nearly 46 months after joining the apprenticeship program, McDermott worked for GROB. Because McDermott had a year of his education completed when he started the apprenticeship, he was "fast-tracked" into specialized training.

{¶5} On March 26, 2021, McDermott resigned his employment with GROB effective April 7, 2021. At the time McDermott notified GROB of his resignation, McDermott was 71 days shy of 4 years in the program.

**{¶6}** Following his resignation, GROB's CFO sent McDermott a letter informing him that he was required to reimburse GROB pursuant to paragraph 14 of the parties' contract. McDermott responded that he believed he fulfilled the requirements of the agreement.

**{¶7}** On June 9, 2021, GROB filed a complaint against McDermott alleging, *inter alia*, breach of contract. GROB sought to recover $25,000 pursuant to paragraph 14 in the contract. McDermott denied breaching the contract, maintaining that he had fulfilled the agreement.[2]

**{¶8}** The parties filed cross-motions for summary judgment. After reviewing the evidence submitted, the trial court filed a written entry determining that GROB was entitled to summary judgment on its claim for breach of contract. However, the trial court determined that "paragraph fourteen does not establish $25,000.00 in damages. Instead, it speaks to an 'estimated cost of $25,000.' The issue of the specific amount of damages, if any, is an issue of material fact that cannot be resolved on summary judgment." (Doc. No. 58).

**{¶9}** A hearing on the issue of damages was held March 31, 2023. At the hearing, GROB presented evidence that it had incurred $15,202.09 in costs for McDermott's tuition, his job training, and a trip to Germany. However, GROB's CFO did testify on cross-examination that when one apprentice in the past left the

---

[2] McDermott initially argued to the trial court that the contract required 2 years of practical training and 2 years of specialized training. He contended he had been fast-tracked through practical training due to his education, and he had completed over 2 years of specialized training.

apprenticeship after only a year, GROB prorated the costs. (March 31, 2023, Tr. at 46). McDermott argued that any damages in this case should be minimal given that GROB had the benefit of McDermott's services for nearly the entire contractual period.

On April 27, 2023, the magistrate issued a decision stating as follows:

The Magistrate finds that the most appropriate method to determine Plaintiff's actual harm is to prorate the damages proven at trial and assign a particular value to the days remaining in the contract period. This is for several reasons. First, paragraph fourteen of the contract does not create a valid liquidated damages claim, nor does Plaintiff argue that it does. Despite the fact that the provision requires Defendant "to fully reimburse GROB for all cost [sic] incurred on behalf of the Apprentice," full reimbursement of the entirety of four years' worth of costs is not the appropriate measure of damages under this contract. Drafted differently, a different result may have occurred, but the Court must consider the contractual language Plaintiff utilized.

* * *

During the time of his employment, Plaintiff and Defendant both received the value of their bargain. Plaintiff trained a potential life-long employee in a specialized area and earned the value of Defendant's labor. Defendant received specialized training at no cost and the wages for his work. If Defendant had worked the full four-year period, Plaintiff would have suffered no losses under the contract. Plaintiff's losses only occurred because Defendant breached the contract early. It is this early termination and the days remaining in the four-year employment term that accurately reflects Plaintiff's actual damages under the contract.

The total proven damages should therefore be divided by the total number of days in the four-year term Defendant was obligated to fulfill under his employment contract. Defendant signed his Apprenticeship Agreement on June 5, 2017. Four years from that date, as required by paragraph four of the Apprenticeship Agreement, is June 5, 2021. * * * Defendant was obligated to work for Plaintiff for

1461 days. The total proven damages at trial were $15,202.09. When these total damages are divided by 1,461 days, this creates a daily rate of $10.41.

(Doc. No. 61). The magistrate then multiplied the daily rate by the days remaining and determined that GROB's actual damages amounted to $739.11. The magistrate then recommended that GROB be granted judgment for that amount.

**{¶10}** GROB objected to the magistrate's decision, arguing that the pro-rata award was not appropriate and that GROB should have been awarded all costs incurred that it had proven, specifically $15,209.09. The trial court disagreed, reasoning

[t]he Plaintiff's argument is an all or nothing approach. The Plaintiff's argument is that the damages should be calculated the same whether the Defendant breached the agreement on the first day or the last day of the program. As a result, the Plaintiff's objection to the pro rata calculation used by the Magistrate is about not getting the full $15,202.09. However, the Plaintiff does not present any other method of calculating their actual damages. As the Court agrees with the Magistrate that the Plaintiff is not entitled to a windfall amount of $15,202.09, the method used by the Magistrate is reasonable given the facts of this case and results in a determination of the actual damages incurred by the Plaintiff as a result of the breach by the Defendant. The $739.11 puts the Plaintiff in the exact same position as it would have been had the Defendant completed the program and quit the next day.

(Doc. No. 65).

**{¶11}** A final judgment entry awarding GROB $739.11 in damages for McDermott's breach of contract was filed September 18, 2023. It is from this

judgment that GROB appeals, asserting the following assignments of error for our review.

**First Assignment of Error**

**The trial court erred when it failed to apply the clear and unambiguous language of the agreement in dispute and awarded damages on a pro rata basis.**

**Second Assignment of Error**

**The trial court's award of damages is against the manifest weight of the evidence.**

{¶12} As the assignments of error are interrelated, we elect to address them together.

*First and Second Assignments of Error*

{¶13} In GROB's assignments of error, GROB contends that the trial court's award of damages was against the manifest weight of the evidence. Specifically, GROB argues that the trial court should have awarded the total amount of costs that were proven according to paragraph 14 in the parties' agreement.

Standard of Review

{¶14} In a civil appeal from a bench trial, we generally review the trial court's judgment under a manifest weight standard of review. *E.G.*, *Tecumseh Landing, L.L.C. v. Bonetzky*, 3d Dist. Logan No. 8-14-22, 2015-Ohio-2741, 38 N.E.3d 1149, ¶ 25; *Yagour Group, LLC v. Ciptak*, 8th Dist. Cuyahoga No. 112846, 2024-Ohio-73, ¶ 35. The Supreme Court of Ohio explained weight of the evidence

in a civil context in *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972

N.E.2d 517, as follows:

> "Weight of the evidence concerns 'the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the [trier of fact] that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief.' "

(Emphasis deleted.) *Id.* at ¶ 12, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387,

678 N.E.2d 541 (1997), quoting *Black's Law Dictionary* 1594 (6th Ed.1990).

{¶15} In assessing whether a verdict is against the manifest weight of the

evidence, we examine the entire record, weigh the evidence and all reasonable

inferences, consider the witnesses' credibility, and determine whether, in resolving

conflicts in the evidence, the trier of fact clearly lost its way and created such a

manifest miscarriage of justice that the verdict must be overturned and a new trial

ordered. *Eastley* at ¶ 20, citing *Tewarson v. Simon*, 141 Ohio App.3d 103, 115 (9th

Dist.2001). However, "[i]n reviewing the judgment of a trial court following

a bench trial as being against the manifest weight of the evidence we are guided by

a presumption that the trial court's findings are correct." *Bonetzky* at ¶ 25.

Analysis

{¶16} GROB contends that the trial court should have applied the "unambiguous" language in paragraph 14 of the parties' contract. Again, this provision reads, in pertinent part, as follows:

> Should the Apprentice choose to end his/her employment before [] completion * * * Apprentice agrees to fully reimburse GROB for all cost [sic] incurred on behalf of the Apprentice, during his/her participation in the apprentice program. Reimbursement, estimated cost of **$25,000**, will be paid to GROB within the next 3-months following the employment separation. * * *

(Bold in original). Since the contract referred to "estimated" costs, the trial court held a hearing for GROB to prove its actual costs associated with McDermott's training. The evidence established, and it is not contested at this point, that GROB's incurred costs were $15,202.09.

{¶17} The trial court did not award GROB its total incurred costs because it determined that paragraph 14 was not meant to be a liquidated damages provision, and because the $15,202.09 figure was not actually reflective of damages incurred by GROB since McDermott had so nearly fulfilled the terms of the contract. The trial court noted that if McDermott had stayed the final months of his contract, GROB would have had no damages, making it illogical that GROB should be awarded the total costs incurred since the contract was nearly fulfilled. *Triangle Properties, Inc. v. Homewood Corp.*, 10th Dist. Franklin No. 12AP-933, 2013-Ohio-3926, 3 N.E.3d 241, ¶ 52 ("Although a party damaged by the acts of another

is entitled to be made whole, the injured party should not receive a windfall; in other words, the damages awarded should not place the injured party in a better position than that party would have enjoyed had the wrongful conduct not occurred."). We see nothing unreasonable with the trial court's determination on this issue.

{¶18} Notably, neither party presented a mathematical method to determine what GROB's actual damages were in this case given how close McDermott was to fulfilling his contract.[3] The trial court thus employed its own valuation, breaking the contract down by number of days remaining out of the total contract amount versus dollars incurred for training over the course of the contract. After reviewing the record, we find nothing illogical about the trial court's valuation here.

{¶19} In sum, we do not find that the trial court erred by determining that the award of $739.11 was proper to make GROB whole for McDermott's breach of contract. GROB received nearly the entirety of the benefit of its bargain with McDermott and we do not find that the trial court clearly lost its way or created a manifest miscarriage of justice. As we have found that the trial court's determination to award GROB $739.11 is not against the manifest weight of the evidence, and that the trial court did not err by utilizing a prorated amount of damages, GROB's first and second assignments of error are overruled.

*Conclusion*

---

[3] We note that there was testimony that McDermott was "fast-tracked" into specialized training and he was often sent out as the sole GROB employee to perform a job unrelated to training, earning money for GROB.

**{¶20}** Having found no error prejudicial to GROB in the particulars assigned and argued, the assignments of error are overruled and the judgment of the trial court is affirmed.

*Judgment Affirmed*

**ZIMMERMAN AND MILLER, J.J, concur.**

/tmm